Biggs v. Bank of Marshfield et al.

[No. 13,239. Filed December 10, 1929.]

*Burton B. Berry* and *Wilbur G. Nolin*, for appellant.
*Victor H. Ringer* and *William H. Ringer*, for appellees.

McMAHAN, J.—This is an action by appellees against Emma B. Biggs to enjoin the sale and removal of a McDonald pitless farm and stock scales, two galvanized water tanks, a hayfork with rope used therewith and connected with the hay carrier in a barn, and a Delco light plant with pulley machine, battery and accessories used in connection therewith, all of which are alleged to be fixtures on certain real estate formerly owned by Stanley O. Biggs, and which he and his wife, appellant herein, sold and conveyed to Pearl J. Chandler, as trustee for the Bank of Marshfield. The plaintiffs had judgment, hence this appeal. The errors assigned are the overruling of a demurrer to the complaint and of a motion for a new trial.

Inasmuch as there has been a fair trial upon the merits

and all the evidence was introduced without objection, it will not be necessary for us to consider the ▉ sufficiency of the complaint. *Pittsburgh, etc., R. Co.* v. *Rushton* (1925), *ante* 227, 148 N. E. 337, 149 N. E. 652.

Appellant contends that the decision of the court is not sustained by sufficient evidence.

The salient facts as disclosed by the evidence are as follows: On October 20, 1925, and for many years prior thereto, Stanley O. Biggs, husband of appellant, was the owner of about 250 acres of land in Warren county, which was used as a stock and grain farm; the main buildings are on the part known as "the west farm" and were occupied by Stanley O. Biggs and family; the dwelling house was equipped with electric lights, hot and cold water; the current for the lights was generated by a Delco light plant consisting of a gasoline engine and dynamo fastened with bolts on a concrete foundation in a pump-house, the foundation having been built expressly for that purpose; this foundation was set in the ground, a hole having been cut through the floor so as to permit the construction of the foundation, which extended into the ground about three feet; pulley machinery was also erected and constructed in the same building with pulleys for the use of belts which were used in operating the Delco light plant and in pumping water; the gasoline engine furnished the power for pumping water for the residence and for the live stock on the farm; wires ran from the electric generator, which was connected with the gasoline engine, to the dwelling house; the generator also provided electricity for charging the storage batteries connected with the lighting system; electric wires ran from the plant in the pump-house to and through the outside walls through holes and into the dwelling house, where they connected with the wires and light fixtures in the house; the Delco light plant, the

pulley machinery, generator, batteries and accessories connected therewith, were a part of a system of conveniences and betterments connected with the house, outbuildings and the water system of the house and barn lots; the farm was, and for many years had been, equipped with what is known as "pitless" farm scales, the frame of which rested on concrete abutments, with approaches built at each end of the platform in order to make it convenient and easy to drive on the scales; the barn, which was 60 feet long and 40 feet wide, was equipped with a hayfork and a track and carrier near the roof, and operated by means of a long rope attached to the fork; there were two large water tanks on the farm, one of which was on the west farm and one on the east farm; the one on the west farm rested on a board foundation, the pipe leading from the pump-house was so constructed that the water flowed into a wooden box and from that overflowed into the stock tank over the top of the tank; the water for this tank was pumped by the plant located in the pump-house; the water tank on the east farm rested on the ground, the water on this farm being pumped from a well and conveyed to this tank by means of a pipe; these tanks were part of a system provided for furnishing water for live stock on the farms so owned by Biggs; the Delco light plant, gasoline engine, pulley machinery, generator, batteries, scales, water tanks, the hayfork and the rope, used in connection with the hayfork, were worth from $500 to $550, and their removal from the farm would lessen the value of the farm to that extent; a short time prior to October 20, 1925, the Bank of Marshfield recovered judgments against Stanley O. Biggs in the sum of $5,895, which were liens on the real estate so owned by said Biggs, and which was then mortgaged to secure the payment of notes for $12,000; the land was also subject to taxes which were then delinquent; executions had been issued

against Biggs and were in the hands of the sheriff on October 20, 1925, on which day, Biggs, his wife joining, by warranty deed conveyed all of the real estate so owned by him to Pearl J. Chandler as trustee for said bank, the conveyance being subject to the two mortgages and taxes; in order to induce Mrs. Biggs to join in said deed, the bank paid her a cash consideration of $5,000; this deed gave Biggs the right to use and occupy the lands so conveyed until March 1, 1926; Mrs. Biggs owned no real estate and had advertised all of her tangible personal property except some household goods for sale on February 4, 1926, preparatory to surrendering possession of the farm and moving elsewhere; the $5,000 which she received from the bank had been invested in preferred stock in a "building industry" in Indianapolis, neither the nature of such industry nor the value of such stock being shown; when the contract was made wherein appellant and her husband agreed to convey the real estate to the trustee, appellant said they would reserve the storm windows and storm doors, which had been previously attached to the house, and, in that connection, referred to the fact that they were giving $500 worth of property in the light plant. Referring to the two water tanks, appellant's husband testified they were worth from $8 to $10.

Appellant insists the judgment must be reversed because the evidence fails to show that the threatened removal, if carried out, would produce irreparable injury. In this connection, she cites *Miller* v. *Burket* (1892), 132 Ind. 469, 474, 32 N. E. 309, where the court says: "An injunction will never be awarded to restrain the commission of a mere trespass, where it is not shown that the threatened injury will be irreparable, and that full and adequate compensation can not be had in an action at law." That was a case where the defendants had entered a wheat field which

was in the possession of the plaintiff and had started to cut and harvest the wheat, denying the right of the plaintiff to harvest the same. The question there involved, in the words of the court, referred "alone to the claim by the defendants of a right to enter and cut the wheat in controversy." The court called attention to the fact that the defendants asserted no interest in or right to the land other than the right to enter upon it for the purpose of cutting and removing the wheat, and, in discussing the question, said: "An injunction will, however, be awarded to prevent a threatened continuous disturbance of the possession of the rightful owner of land."

In *Wabash R. Co.* v. *Engleman* (1903), 160 Ind. 329, 66 N. E. 892, there was a dispute as to the ownership of a strip of land which the railroad was threatening to enclose with a fence. There was no claim there of any threatened damage to the inheritance. The complaint was to enjoin the railroad from enclosing the land with a fence. It was there said that: "The right to invoke the jurisdiction of a court of equity must depend upon the peculiar or particular facts in each case, and one of the questions to be decided is whether the legal remedy under the particular circumstances of the case is adequate, or, in other words, is such remedy as practicable and efficient to promote the interests of justice and its prompt administration as is the remedy in equity?" Referring to *Jerome* v. *Ross* (1823), 7 Johns. Ch. (N. Y.) 315, 11 Am. Dec. 484, cited by appellant, where Chancellor Kent said, "I do not know a case in which an injunction has been granted to restrain a trespasser, . . . without showing that the property itself was of a peculiar value, and could not well admit of due recompense, and would be destroyed by repeated acts of trespass," the court said the strict rule so expressed by Kent had been relaxed by modern decisions.

The instant case does not involve a mere trespass. We are here dealing with a threatened injury to the inheritance by one in lawful possession of the real estate— a question of waste, as distinguished from trespass.

Pomeroy defines waste as "the destruction or improper deterioration or material alteration of things forming an essential part of the inheritance, done or suffered by a person rightfully in possession by virtue of a temporary or partial estate, as, for example, a tenant, for life or for years. The rightful possession of the wrongdoer is essential, and constitutes a material distinction between waste and trespass." 4 Pomeroy, Equity Jurisp. §1348.

From its very nature waste is a wrong such that the legal remedy of damages is inadequate. It involves as its chief characteristic a serious injury to real property, and, on this ground alone, a preventive remedy is necessary. And because prevention is of greater efficacy than damages after the event, the equitable remedy has virtually superseded the common-law action of waste. 5 Pomeroy, Equity Jurisp. §1896. And, as stated by the same author in §1897, "Waste generally falls within that class of injuries which courts of equity deem irreparable and therefore not to be adequately remedied at law. Hence injunctions against legal waste have always been common, and the jurisdiction extensive." The same thought is expressed in *Vandemark* v. *Schoonmaker* (1876), 9 Hun. (N. Y.) 16, where the court used the following language: "Waste has always been a subject of chancery jurisdiction. It is generally irreparable in its results, hence especially within the restraining power of that court. And it has been well remarked that courts of equity will exercise a liberal jurisdiction in respect to waste, and in its restraint."

While equity will not enjoin trivial acts of waste, and

will require a showing of substantial damage, an act of waste, which, from its nature, causes a serious injury to realty, comes within the class of acts called irreparable. *Gause* v. *Perkins* (1857), 56 N. C. 177, 69 Am. Dec. 728.

Appellant introduced evidence to the effect that the property which she had advertised for sale could be removed without serious permanent injury to the buildings or the land and that, by the substitution of other property of the same or other like make, the farm could be conducted the same as before the removal. Referring to this evidence, she says the injunction should not have been granted because it shows the injury would not be irreparable.

In *Schmaltz* v. *York Mfg. Co.* (1902), 204 Pa. St. 1, 53 Atl. 522, 93 Am. St. 782, an injunction prohibiting the removal of a refrigerator plant from a brewery was sustained. In discussing the claim that the refrigerator could be removed without serious permanent injury, and that, by the substitution of another of the same or other make, operation could be continued and conducted the same as before the removal, the court said: "The same could be said with equal force of any other part of the machinery necessary for the operation of the brewery. Any or all of the different parts constituting the plant could be supplied, and hence, on this theory, all the machinery might be removed and no irreparable injury be done to the plant or to the owner. The same logic would permit the destruction of any building or manufactory by force, as restitution would prevent irreparable injury. Removing a constituent and necessary part of the plant prevents its operation and results in a loss of the business, compensation for which would be determinable solely by conjecture. In one sense this may not be irreparable injury, but in the legal sense it is, and will authorize the interference of a

chancellor. Equity will interfere when the injury threatened would occasion damages, estimable only by conjecture and not by any accurate standard; . . . or would be ruinous to the property in the manner in which it has been enjoyed and would permanently impair its future enjoyment."

As was said in *Champ* v. *Kendrick, Trustee* (1892), 130 Ind. 549, 30 N. E. 787: "It is not necessary, under our code of practice, to aver or prove that the plaintiff will suffer irreparable injury if the relief by injunction is not granted. All that is necessary is to aver and prove that the plaintiff will suffer *great* injury." Nor is it necessary to allege or prove that the defendant is insolvent. All that is necessary is to allege facts showing that the "plaintiff will suffer great injury." §1225 Burns 1926, §1148 R. S. 1881; *First Nat. Bank* v. *Savin* (1911), 47 Ind. App. 266, 272, 94 N. E. 347, and authorities there cited.

If appellant had rented the real estate from appellee, and, on the day she was moving onto the same, appellees had undertaken to remove the light plant and the other articles in question, under the claim that they were not covered by the lease, the probabilities are that appellant would have been the plaintiff in an action seeking an injunction to prevent such removal.

The decision in the instant case is amply sustained by the evidence. There was no error in overruling the demurrer to the complaint, nor in overruling the motion for a new trial. The death of appellant having been suggested, the judgment is affirmed as of the date of submission.