GEORGE WESLEY GOFF, JR., PATRICIA ANN GOFF, D/B/A MID-
TOWN REALTY CO. *v.* HARLEY R. GRAHAM,
FLORENCE T. GRAHAM.

[No. 2-1172A114. Filed February 4, 1974. Rehearing denied
March 1, 1974.]

*Dean E. Richards,* Indianapolis, for appellant.

*A. Joseph Maloof,* Indianapolis, for appellee.

SULLIVAN, P.J—Defendants-appellants George Wesley Goff and Patricia Ann Goff, d/b/a Mid-Town Realty Co. (Goff) (purchaser) appeal from a judgment awarding damages and which had the effect of cancellation of a Conditional Sales Contract for Real Estate. The findings of the Court specifically found that defendants had breached the contract. The judgment did not specifically restore permanent possession to the vendor nor did it decree that the contract was terminated and cancelled. The parties, however, have acquiesced in a construction of the judgment which terminates the contract, e.g., defendants have waived any claim to specific performance of the contract by vendor.

On May 31, 1971, Goff purchased five parcels of real estate from Harley and Florence Graham (vendor) by virtue of five sales contracts which were identical in all respects except for the legal descriptions of the property and the consideration to be paid therefor. The parties throughout the proceedings below and in their briefs herein refer to the sales agreement as being a single contract. Since neither party has argued that the contracts must be considered individually, for the purposes of this opinion we shall consider the five separate agreements as one contract. The properties were investment properties containing some thirty rental units. At the time of the sale,

all of the apartments were occupied by tenants. The contract contained the following pertinent provisions:

"2. Taxes and Insurance.
    a. Taxes. Purchaser shall pay the taxes on the Real Estate beginning with the installment payable by the first Monday in November, 1971, and all installments of taxes payable thereafter.
    b. Assessments. Purchaser shall pay all assessments for municipal or other public improvements becoming a lien after this date.
    c. Insurance. Purchaser shall keep the improvements on said real estate insured under fire and extended coverage policies and pay the premiums on such insurance policies as they become due. Such insurance shall be obtained from companies approved by Vendor and in an amount not less than the balance of the purchase price due hereunder, or to the full extent of their insurable value, if that is less. Such policy or policies shall be issued in the names of Vendor and Purchaser, as their respective interests may appear, and shall be delivered to and retained by Vendor during the continuance of this agreement.

\*   \*   \*

"Insurance is to be prorated as of the 1st day of the month following the date of execution and delivery of the conditional sales contract. Purchaser is to keep property in good repair, and to maintain said properties in accordance with the laws of the State of Indiana and City of Indpls.

\*   \*   \*

"7. Use of the Real Estate by Purchaser; Vendor's Right of Inspection; Purchaser's Responsibility for Injuries.

    a. Use. The Real Estate shall not be rented, leased or occupied by persons other than Purchaser, nor shall any of the improvements now or hereafter placed thereon be changed, remodeled, or altered in any way unless Purchaser shall first obtain the written consent of Vendor. No additional improvements shall be placed on the Real Estate by Purchaser unless written consent of Vendor shall have been first obtained. Purchaser shall use the Real Estate and the improvements thereon carefully, and shall keep the same in good repair at his expense. Purchaser shall not commit waste on the Real Estate. In his occupancy of the Real Estate, Purchaser shall comply with all laws, ordi-

nances, and regulations of any governmental authority having jurisdiction thereof.

\* \* \*

"8. Vendor's Remedies on Purchaser's Default. Time shall be of the essence of this agreement. If Purchaser fails to pay any installment of the purchase price or interest thereon, or any installment of taxes on the Real Estate, or assessment for a public improvement, or any premium of insurance, as the same becomes due, and if such failure continues for a period of sixty (60) days; or if Purchaser fails to perform or observe any other condition or term of this agreement and such default continues for a period of sixty (60) days after written notice thereof is given to Purchaser; then Vendor may, at his option:

    a. Cancel this agreement and take possession of the Real Estate, and remove Purchaser therefrom, or those holding or claiming under him, without any demand.

    b. Declare the entire unpaid balance of this contract immediately due and payable, and in such event, Vendor may pursue whatever remedies, legal or equitable, are available to collect the entire unpaid balance of the purchase price.

    c. Exercise any other remedies available at law, or in equity.

"The remedies herein provided shall be cumulative and not exclusive. Failure of Vendor to exercise any remedy at any time shall not operate as a waiver of the right of Vendor to exercise any remedy for the same or any subsequent default at any time thereafter. In the event of Vendor's cancellation after default by Purchaser, all rights and demands of Purchaser under this contract and in and to the Real Estate shall cease and terminate and Purchaser shall have no further right, title or interest, legal or equitable, in or to the Real Estate and Vendor shall have the right to retain all amounts theretofore paid by Purchaser as agreed payment for Purchaser's possession of the Real Estate prior to default. Such retention shall not bar Vendor's right to recover damages for unlawful detention of the real estate after default, for any failure to pay taxes or insurance, for failure to maintain the Real Estate at any time, for waste committed thereon or for any other damages suffered by Vendor, including reasonable attorney's fees incurred by Vendor in enforcing any right hereunder or in removing any encumbrance on the Real Estate made or suffered by Purchaser."

The total contract price was $61,750.00, payable over 20 years at 6% interest. Vendor Graham took a down payment of $1950.00 and accepted a promissory note for $1442.00. Monthly payments in the amount of $562.62 were to be paid.

On the date the contract was executed, vendor delivered to purchaser copies of premium renewal notices for insurance policies which vendor had procured during his possession. The notices revealed that premiums for continuation of insurance on the various parcels were due June 8, 1971, July 11, 1971, July 29, 1971, February 14, 1972 and February 27, 1972.

On July 7, 1971 purchaser paid the first contract installment which was due July 1. However, purchaser did not obtain his own insurance coverage for the subject properties nor did he pay the premiums on the vendor's policies as they became due; neither did he make any payments in connection with contractually required pro-ration of premiums which had been prepaid by vendor.

After the purchaser failed to make the second contract payment due August 1, relations between the parties became strained. Graham demanded that Goff pay the insurance premiums since some of the properties were at that time uninsured Several heated arguments ensued and in the middle of August, the purchaser was sent a letter demanding payment of the insurance and the August 1 contract installment. He was instructed that upon failure to do so he was to surrender possession of the buildings on August 27.

Various tenants testified that during the month of August, purchaser began removing furniture from the apartments, selling some and taking the rest to his home and to other investment properties he owned nearby.

In late August, thinking that purchaser was about to surrender possession, vendor told three or four tenants to make future rent payments to him. When purchaser did not sur-

render possession, vendor told the tenants to make their payments to purchaser.

Purchaser failed to make the third contract payment which was due September 1. On September 2, 1971, vendor filed suit for cancellation of the contract, seeking damages and the appointment of a receiver for the properties.

At the time the suit was filed, purchaser had not obtained new insurance upon the properties, had not paid any of the insurance renewal premiums due in June or July, had not tendered any sort of pro-rated refund of the pre-paid insurance premiums, and he had failed to make the second and third contract payments. Furniture had been removed from the apartments and the properties to a degree had begun to deteriorate.

Purchaser testified that during the period of June 1 to September 2, he collected a total of $6,352.99 in rent while making the one installment payment of $562.62.

The Marion County Division of Public Health cited one of the apartment buildings on September 8, 1971 for inadequate rubbish containers, accumulation of trash and improper storage of a refrigerator.

After a hearing, the parties on September 15, 1971 stipulated and the court so ordered that the contract could continue under the following conditions:

1. Purchaser would make the August 1 and September 1 payments by October 1.
2. Purchaser would obtain fire and liability insurance by October 1.
3. Purchaser would make the October 1 payment on October 15.

If the above requirements were not complied with, it was stipulated and ordered that a receiver would be appointed.

Purchaser filed a counter-claim for breach of contract on September 24, 1971, seeking $32,451.00 in damages. A second paragraph was later added seeking specific performance. The

latter claim was specifically waived by purchaser in his appellate brief.

Purchaser failed to make the three payments as called for by the stipulation and failed to insure the properties. A receiver was appointed by the court on October 18.

The receiver discovered that many utility payments were delinquent and shut-offs had occurred or were threatened. Many of the apartments were vacant. Former tenants testified that they had moved because purchaser had refused to make needed repairs or had not called pest exterminators when they were needed. There was testimony that after the receiver was appointed, purchaser had encouraged tenants to move out of the subject property and into apartments owned by purchaser nearby. Purchaser continued to remove furniture, knowingly allowed a bootlegging operation to operate in one apartment and permitted a "poker parlor" to operate all night long on week-ends.

On January 25, 1972, the trial court discharged the receiver and returned temporary possession of the apartments to vendor. The trial court entered a judgment in favor of vendor on June 30, 1972. The court awarded damages of $1686.00, the sum representing the contract payments due on August 1, September 1 and October 1; and awarded $2500.00 to Graham for damages to the property.

The purchaser's brief presents the main argument as follows: "Although much evidence was presented at the trial of this cause, along with supporting exhibits, the issue in this case is very simple. Did the plaintiffs, in filing their complaint against the defendants on September 2, 1971, prematurely file their complaint and thus be guilty of anticipatory breach?" The only issue presented by such argument is whether the evidence was sufficient to support the findings and judgment of the trial court that the purchaser, and not the vendor, has breached the contract. Resolution of the issue requires us to determine: (1) Whether the evi-

dencé supports a finding that purchaser breached the contract, and (2) Whether the evidence *requires* a finding that vendor committed an anticipatory repudiation? We also consider as being properly raised the purchaser's contention that the damages awarded to the vendor were excessive and unsupported by the evidence. Other "issues" raised by purchaser are premised upon the assumption that vendor and not purchaser had first breached the contract. Such assumption is incorrect in light of the facts. Therefore, such "issues" are without determinative substance.[1]

## THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE TRIAL COURT'S FINDING THAT PURCHASER BREACHED CONTRACT

In deciding the first question, we are necessarily mindful of a fundamental tenet of appellate review:

". . . when sufficiency of the evidence is questioned on appeal, the court of review does not weigh the evidence but considers only the evidence most favorable to appellee together with the reasonable inferences to be drawn therefrom." *Muehlman* v. *Keilman* (1971), 257 Ind. 100, 272 N.E.2d 591, 595.

The principal breach insofar as vendor was concerned was purchaser's refusal to insure the properties.

Purchaser contended at trial that he was not in default when vendor filed suit because the insurance payments were not due until November 1. However, he does not support this contention except by way of an inference that he believed the proration was tied somehow to property taxes due in November.

The contract provided that "Purchaser shall keep the improvements on said real estate insured under fire and extended

---

1. Goff also claims that he was "denied a fair trial because of irregularities in the proceedings of the court." He does not specify these alleged irregularities nor argue the issue in his brief. No question in this regard is before us. Rule AP. 8.3(A)(7).

coverage policies and pay the premiums on such policies as they became due.

. . . Such policies . . . shall be delivered to and retained by vendor during the continuance of this agreement. . . . Insurance is to be prorated as of the first day of the month following the date of execution and delivery of the conditional sales contract." Vendor testified that his interpretation of the contract was that purchaser would refund to him the pro-rata refund of prepaid insurance policies still in effect after June 1,[2] and then would assume responsibility for renewing the policies as the premiums become due. There was testimony that purchaser had begun the steps necessary to have new policies issued, and had only to pay the premiums. Despite frequent assurances by the purchaser during the summer that he would take care of the insurance, the premiums were never paid. Thus by practical construction of the contract and by virtue of the purchaser's own course of conduct, purchaser's claim that the insurance was not due until November is negated.

The most reasonable interpretations of the insurance clause are:

1. Either that purchaser was to continue vendor's insurance and pay him for it as of June 1, procuring his own policy when vendor's expired, or
2. Purchaser was to obtain his own insurance on June 1st, and vendor would get a rebate on the unused portion of his policies in effect at closing.

However, under any reasonable interpretation of the contract, purchaser was required to have obtained insurance in

2. While it is arguable that the term "prorated" concerns only an accounting procedure and does not by strict definition give rise to a duty to pay the amount thus allotted, we think it clear that such a duty is implicit in this instance. If Purchaser was under no duty to furnish Vendor with a rebate, the proration clause would be unnecessary, having no purpose under that construction. A construction which regards language in the contract as surplusage is to be avoided if a reasonable interpretation may be given to the words of the parties. (*Cornet* v. *Guedelhoefer* (1941), 219 Ind. 200, 36 N.E.2d 933). We further note that "prorate" has been considered to mean "distribute" as well as "allot". See *Joy* v. *Rousseau* (1925), 71 Cal. App. 179, 236 P. 972.

some manner before existing policies lapsed, and purchaser further was required to furnish proof of such insurance to vendor. This was not done. Purchaser breached the contract by not rebating to vendor his share of the prepaid insurance prorated as of June 1. Purchaser further breached the contract by not insuring the first property when vendor's insurance expired on June 8, 1971. By September 2, 1971, three of the five subject properties were wholly uninsured.

Purchaser next contends that vendor did not have the right to take action against a contract breach until 60 days after written notice thereof was served upon Purchaser. The contract provided that:

> "Time shall be of the essence of this agreement. If Purchaser fails to pay any installment of the purchase price or interest thereon, or any installment of taxes on the Real Estate, or assessment for a public improvement, or any premium of insurance, as the same becomes due, and if such failure continues for a period of sixty (60) days; or if Purchaser fails to perform or observe any other condition or term of this agreement and such default continues for a period of sixty (60) days after written notice thereof is given to Purchaser; then Vendor may, at his option:
>
> a. Cancel this agreement and take possession of the Real Estate, and remove Purchaser therefrom, or those holding or claiming under him, without any demand.
>
> b. Declare the entire unpaid balance of this contract immediately due and payable, and in such event, vendor may pursue whatever remedies, legal or equitable, are available to collect the entire unpaid balance of the purchase price.
>
> c. Exercise any other remedies available at law, or in equity."

It is our opinion that the clear language of the contract required no notice before the beginning of the sixty day grace period for failure to pay a contract installment, property taxes, an assessment for a public improvement, or an insurance premium. All *other* breaches required notice to be given before the sixty day period began to run.

Even were the language of this provision of the contract deemed ambiguous, the subject matter of the contract and the attendant circumstances would be viewed in order to determine the intent of the parties. *Standard Land Corporation of Indiana* v. *Bogardus* (1972), 154 Ind. App. 283, 289 N.E.2d 803; *Wills* v. *Gaff* (1963), 136 Ind. App. 21, 191 N.E.2d 41. Under circumstances as here present, there is no need to give notice. The purchaser *knows* when he fails to pay an installment due on a date certain or an insurance premium—he is aware that he is in technical breach and that the 60 day period is running. In comparison, the purchaser may be unaware that, for example, the vendor considers the covenant to keep in good repair to have been breached. Clearly, the "other conditions" are such that notice is properly required. Since no notice was required before the 60 day period began to run, purchaser's breach as to the insurance provisions was actionable on September 2.

The final question to be answered in this portion of our discussion is whether, having established an actionable breach on September 2, 1971, vendor was entitled to a cancellation of the contract rather than mere compensatory damages for the breach.

As stated in *Faylor* v. *Brice* (1893), 7 Ind. App. 551, 553, 34 N.E. 833:

"While forfeitures are never favored in law, yet when by a reasonable construction, it appears that the contracting parties agreed that a forfeiture should take place, upon the failure of one of the parties to the contract to comply with a material part thereof, courts will decree a forfeiture."

Our determination thus depends upon whether the breach is a material one, going to the heart of the contract. Whether such a total breach exists is to be determined under the facts of the case, and whether the breach is material is itself a question of fact, to be decided by the trier of fact. See 6 Williston on Contracts, § 841 (3rd Ed.). As we have noted, it

is not our function to reweigh the evidence in reviewing the trial court's findings of fact.

The Restatement of Contracts § 275 succinctly summarizes the considerations used in determining the materiality of a breach:

"(a) The extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated;

(b) The extent to which the injured party may be adequately compensated in damages for lack of complete performance;

(c) The extent to which the party failing to perform has already partly performed or made preparations for performance;

(d) The greater or less hardship on the party failing to perform in terminating the contract;

(e) The wilful, negligent or innocent behavior of the party failing to perform;

(f) The greater or less uncertainty that the party failing to perform will perform the remainder of the contract."

Most recently our Supreme Court in *Skendzel* v. *Marshall* (1973), 261 Ind. 226, 301 N.E.2d 641 dealt with the reluctance of the courts to permit forfeitures under land contracts. In quoting from Pomeroy, Equity Jurisprudence, § 433 (5th ed. 1941), the court said:

"The test which determines whether equity will or will not interfere in such cases *is the fact whether compensation can or cannot be adequately made for a breach of the obligation which is thus secured. If the penalty is to secure the mere payment of money, compensation can always be made, and a court of equity will relieve the debtor party upon his paying the principal and interest. . . .*

[The granting of relief in such circumstances is based on the ground that it is wholly against conscience to say that because a man has stipulated for a penalty in case of his omission to do a particular act—*the real object of the parties being the performance of the act*—if he omits to do the act, he shall suffer a loss which is *wholly disproportionate to the injury sustained by the other party.*]

Pomeroy, *Equity Jurisprudence,* § 433, 5th Edition (1941). (Emphasis added.)"

Justice Hunter, speaking for the court, proceeded to hold:

"A conditional land contract in effect creates a vendor's lien in the property to secure the unpaid balance owed under the contract. This lien is closely analogous to a ██ mortgage—in fact, the vendor is commonly referred to as an 'equitable mortgagee.' *D.S.B. Johnston Land Co.* v. *Whipple, supra; Harris* v. *Halverson, supra.* In view of this characterization of the vendor as a lienholder, it is only logical that such a lien be enforced through foreclosure proceedings. Such a lien 'has all the incidents of a mortgage' (*D.S.B. Johnston Land Co.* v. *Whipple, supra,* at 61), one of which is the right to foreclose."

With reference to factual situations similar to that before us, however, the court acknowledged the propriety of cancellation or forfeiture:

"This is not to suggest that a forfeiture is an inappropriate remedy for the breach of *all* land contracts. In the case of an abandoning, absconding vendee, forfeiture is a logical and equitable remedy. Forfeiture would also be appropriate where the vendee has paid a minimal amount on the contract at the time of default and seeks to retain possession while the vendor is paying taxes, insurance, and other upkeep in order to preserve the premises. Of course, in this latter situation, the vendee will have acquired very little, if any, equity in the property. However, a court of equity must always approach forfeitures with great caution, being forever aware of the possibility of inequitable dispossession of property and exorbitant monetary loss. We are persuaded that forfeiture may only be appropriate under circumstances in which it is found to be consonant with notions of fairness and justice under the law."

From the evidence adduced at trial, the court could reasonably have found that purchaser's failure to insure the properties was wilful and constituted a material breach. While purchaser's breach was not contemporaneous with the commencement of performance, it was preceded only by his down payment, and thus in no sense had substantial performance occurred.

Under the circumstances, there existed great uncertainty that purchaser would perform his continuing obligations under the contract: On September 2, 1971, purchaser had paid no insurance, and was two months in arrears in contract payments, having belatedly paid the first installment. By the time of the trial court's decision on June 30, 1972, the situation had deteriorated further. Evidence indicated that purchaser had committed waste and deliberately neglected the properties, as heretofore set out. Such activities did not auger well for the future performance of the contract over its twenty-year course. We do not thus have before us the harsh forfeiture condemned in *Skendzel* v. *Marshall, supra.*

The facts were sufficient for the trial court to find that vendor was entitled to bring an action for cancellation on September 2, 1971.

## THE EVIDENCE DID NOT REQUIRE THE TRIAL COURT TO FIND VENDOR GUILTY OF AN ANTICIPATORY REPUDIATION

Purchaser contends that the trial court should have found favorably upon the allegations of his counter-claim of September 24 because vendor had committed an anticipatory repudiation of the contract.

We first note that purchaser is appealing from a negative determination. Sufficiency of the evidence in such context does not present an appealable issue and we need only determine whether the decision was contrary to law. *See Graves* v. *City of Muncie* (1970), 255 Ind. 360, 264 N.E.2d 607.

At various places in his brief, purchaser claims three different acts as constituting vendor's alleged anticipatory repudiation. Purchaser first argues that when vendor filed his complaint on September 2, purchaser was not in default, and thus vendor, by prematurely filing, repudiated the contract. As hereinbefore stated, vendor had just cause to file the complaint on September 2.

Purchaser next claims that vendor repudiated the contract by refusing to accept an installment payment tendered to him in person on or about August 6. Even if this were not contradicted by vendor's testimony, no proof of repudiation is thereby made out. The contract provided: "All payments due hereunder shall be made to vendor at The Indiana National Bank, Special Account." (An agent of the bank testified that no contract payments were tendered to the bank after July 7, 1971, nor had vendor instructed the bank not to accept further payments from purchaser.) Thus, the vendor would not have been required to accept a payment tendered to him personally, assuming *arguendo* such a tender was in fact made.

Finally, purchaser argues that vendor's conduct in contacting certain tenants and advising that they withhold payments constituted a repudiation of the contract. Purchaser asserts that vendor's actions made his performance impossible. This ignores the chronology of events: vendor contacted the three or four tenants *after* purchaser had failed to pay the insurance premiums and the August 1 installment. Further, when vendor discovered that purchaser did not intend to surrender possession, he instructed the tenants to pay purchaser. Purchaser's own evidence was that over $6000.00 was collected by September 2. Clearly, purchaser's performance was not made impossible by any act of vendor. Under these circumstances, and considering that vendor's actions were induced by the belief that purchaser had abandoned the contract, we cannot state as a matter of law that vendor repudiated the contract.

## DAMAGES NOT EXCESSIVE

The court awarded damages in the amount of $4186.00, of which $1686.00 was denominated as attributable to unpaid contract payments. The other $2500.00 was apparently intended as compensation for waste committed upon the property by purchaser and the loss of income resulting from tenants who moved away or were moved by purchaser, many of

which empty apartments were not immediately rentable when the vendor regained possession.

With respect to the $2500.00 portion of the judgment, although the evidence was sufficient to prove that these damages existed, there was no evidence from which the trial court could fix a compensatory amount attributable to such damages.

The well established appellate rule, however, is that a judgment will be upheld if it may be sustained upon any theory. *See Devine* v. *Grace Construction & Supply* (1962), 243 Ind. 98, 181 N.E.2d 862; *Ross* v. *Review Bd. of Indiana Employment Security Division* (1962), 243 Ind. 61, 182 N.E.2d 585; *Hatcher* v. *Smith* (1972), 152 Ind. App. 299, 283 N.E.2d 582.

Purchaser testified that in the period of June 1-September 2, he collected rent in the amount of approximately $6350.00. He received this amount as a direct consequence of Graham's performance under the contract, that is, because of vendor's relinquishment to purchaser of the possession and income-producing use of the property.

Under the facts of this case, the trial court would have been justified in awarding money to vendor as restitution after the contract was cancelled. See Restatement of Contracts § 347. One of the alternative methods of evaluating the plaintiff's performance for which restitution is to be made by measuring the extent to which the defendant was enriched by such performance.

Restitution clearly implies a restoration of the status quo. *See Grissom* v. *Moran* (1973), Ind. App., 292 N.E.2d 627. Restoration of the status quo requires not only a consideration of the rental income collected by purchaser as a result of vendor's performance of the contract, but as well a consideration of the benefits derived by the vendor under the contract. The record in this respect discloses that vendor received:

| | |
|---|---|
| Down Payment | $1950.00 |
| June Installment contract payment | 562.62 |
| July, Aug. and Sept. contract payments reflected in judgment | 1686.00 |
| Damages awarded by judgment | 2500.00 |
| Total | $6698.62[3] |

The $6698.62 benefit derived by vendor by virtue of the contract as supplemented by the judgment entered is not excessive in light of the benefit derived by purchaser under the contract. There is evidence of probative value to support the award of $4186.00 in damages under a restitution theory.

Judgment affirmed.

Buchanan, J. and White, J., concur.

NOTE.—Reported at 306 N.E.2d 758.

---

3. We do not include the $1442.00 promissory note executed by purchaser to vendor since the record does not reflect that such has been paid. Furthermore, since the case at bar must necessarily dispose of the respective claims of the parties arising under the contract, liability upon such promissory note must be deemed to be merged in the judgment of the court below.