JOAN FINLEY v. MURIEL E. CHAIN

[No. 2-476A141. Filed April 3, 1978.]

*Patrick N. Ryan, Ryan & Welchons*, of Marion, for appellant.

*Richard L. Swartz, Reading & Swartz*, of Wabash, for appellee.

## CASE SUMMARY:

ROBERTSON, J.—Appellant-defendant, Joan Finley appeals from the judgment of the trial court entered against her in the amount of $4,000.00 for damages for breach of contract, plus $900.00 for attorney fees.

We affirm in part and reverse in part.

## FACTS:

On May 26, 1971, Chain contracted to sell to James and Joan Finley all of her interest in Tonapah, Inc., an Indiana Corporation. The corporation's assets consisted of a three-way liquor permit and the equipment in The Paddock, a tavern (with apartments upstairs) which Chain, the sole stockholder, had been operating. Pertinent parts of the contract read as follows:

> THIS AGREEMENT, made and entered into this 26th day of May, 1971, by and between MURIEL E. CHAIN, hereinafter called 'SELLER', and JAMES E. FINLEY and JOAN FINLEY, husband and wife, hereinafter called 'BUYERS'; WITNESSETH:
>
> For and in consideration of the promises, covenants and agreement set forth hereinbelow, Seller and Buyers do hereby agree as follows:
>
> 1. Seller does hereby agree to sell and convey and does by these presents hereby sell and convey to Buyers, all of her right, title and interest in and to a certain Indiana Corporation, known as Tonopah, Inc. Seller agrees to execute and to deliver to Buyers Forty-nine Percent (49%) of the outstanding common stock issued by Tonopah, Inc., and to execute and deliver to First National Bank in Wabash as Escrow Agent, a stock certificate for Fifty-one Per-

---

1. This case was transferred from the Second District in order to lessen the disparity in caseloads between the districts.

cent (51%) of the common stock issued by Tonopah, Inc., which said stock certificate will be in the name of James E. Finley and is to be held by said escrow agent until Buyers have paid to Seller the total sum of Twelve Thousand Dollars ($12.000.00) plus interest at Seven Percent (7%) computed quarterly in the manner and form as set forth hereinbelow. Upon payment to Seller by Buyers of said sum plus interest, Escrow Agent is authorized to deliver said stock certificate to the said James E. Finley.

2.     Buyers agree to pay to Seller for all of the outstanding shares of common stock issued by Tonopah, Inc., the sum of Twelve Thousand Dollars ($12,000.00), said sum to be paid as follows:

Two Thousand Dollars ($2,000.00) to be paid upon execution of this Agreement, the receipt of which hereby is acknowledged by Seller, and the remaining balance of Ten Thousand Dollars ($10,000.00) to be paid at the rate of Two Hundred Fifty Dollars ($250.00) per month, the first such monthly payment due and payable on July 1, 1971.

. . . .

3.     Seller agrees to pay all obligations of Tonopah, Inc. incurred prior to the transfer of possession of the physical assets of Tonopah, Inc., except for inventory purchased but not delivered prior to the date of such transfer, and Buyers assume and agree to pay all of the obligations of Tonopah, Inc. incurred for the purchase of inventory not delivered until after said date of transfer, and all other obligations of Tonopah, Inc. incurred thereafter. Seller further agrees to sell, convey and transfer and by these presents, does sell, convey and transfer to Buyers all of her equity in a certain tract of real estate located in Wabash County, Indiana, and more specifically described as follows:

. . . .

4.     Buyers agree to pay to Seller for Seller's equity in the real estate described hereinabove in Paragraph 3, the sum of One Thousand Dollars ($1,000.00), and further agree to and do hereby assume to pay and to discharge the present mortage on said real estate, which said mortgage was executed December 17, 1968, with the First National Bank in Wabash, as mortgagee, in the principal sum of Twelve-Thousand Dollars ($12,000.00) and has a current unpaid balance of Nine Thousand Eight Hundred Fifteen Dollars Ninety-eight Cents ($9,815.98), and is payable in monthly installments of One Hundred Thirty-nine Dollars Thirty-four Cents ($139.34), with

the next payment due and payable June 17, 1971. In addition, Buyers do hereby agree to pay that portion of the 1971 taxes, due and payable in 1972, pro rated to the date of the transfer of the physical assets of Tonopah, Inc., and Seller does hereby agree to pay to Buyers upon the execution of this contract, the sum of $173.63 Dollars, as Seller's share of the 1971 taxes, due and payable in 1972, pro rated to the date of the transfer of the physical assets of Tonopah, Inc., based upon the 1970 tax rate, the receipt of which sum hereby is acknowledged by Buyers.

. . . .

6. In the event the Indiana Alcoholic Beverage Commission should refuse to renew the Alcoholic Beverage Permits presently held by Tonopah, Inc., on the next application of Tonopah, Inc., for such renewal, buyers may elect within thirty (30) days from such denial to rescind this contract and agreement, and upon such election, the parties hereto agree to return all consideration received by them under the terms of this Agreement, provided that in the event such denial is the result of any fault or neglect of Buyers, or Buyers' failure to qualify for said permits, Seller may retain as liquidated damages one-half (½) of all consideration received by Seller prior to receipt of notice of Buyers' election to rescind this Agreement and Contract.

7. In the event of failure of Buyers to make any of the payments, or any part thereof, or perform any of the covenants hereby made and entered into, or to keep and observe all of the conditions, covenants, and restrictions set forth herein, this contract shall, at the option of Seller, be forfeited and terminated, and Buyers shall forfeit all payments made on this contract, including without limitation, all payments made to The First National Bank in Wabash, on the mortgage on the real estate described hereinabove in Paragraph 3, and such payments may, with or without notice or demand of any kind, be retained by Seller, provided Buyers shall have a grace period of thirty (30) days, in which to cure any default in failing to make any of the payments required by this Agreement to be made to Seller. In the event Seller's damages shall exceed the payments as made by Buyers, Seller may elect to maintain against Buyers the appropriate legal action to recover the excess in damages, and Buyers agree to pay to Seller in addition to Seller's actual damages all costs, attorney fees and other expenses proximately resulting therefrom, all without relief from valuation or appraisement laws.

. . . .

The last payment Chain received under the contract was the April 1, 1972, payment. In May 1972, the Alcoholic Beverage Commission refused to renew the tavern's liquor permits. In June, Chain learned that the insurance on the building had lapsed and that the business had been abandoned. On June 6, 1972, Chain changed the lock, entered and repossessed the tavern premises. Chain had no communication with James Finley in April 1972, or at any time thereafter, and only one encounter with Joan Finley, in July or August, 1972. At that time she asked Mrs. Finley to explain why so many bills had been unpaid. Mrs. Finley was unable to give her an answer.

Chain filed suit against the Finleys for damages under paragraph seven of the agreement, claiming an amount of damages which included: (a) compensation for payment of unpaid bills, (b) expenses incurred in reapplying for renewal of the liquor permits and loss of profits during that delay, and (c) the cost of lost or damaged property. Because James Finley was not reached for service of process, Joan Finley was the sole defendant. Finley's allegations of error present the following issues for our consideration:

    I.   Was there sufficient evidence for the trial court to find that Chain transferred stock to Joan Finley in accordance with the terms of the contract?

    II.   Was there sufficient evidence for the trial court to find that a default had occurred which would bring into effect the remedial provisions of paragraph seven of the contract?

    III.   Was the trial court's decision granting damages to Chain contrary to law because the damages were too remote?

I.

Finley contends that she cannot be found liable under the contract. She argues that Chain breached the stock transfer provision of the contract and thus rescinded the contract as to her.[2]

---

2.   Finley has raised in her brief the additional argument that the trial court erred in granting recovery under the contract because Chain's act of repossession of the tavern after it was abandoned by the Finleys, amounted to a material breach of the contract and an offer of rescission. This argument was not presented to the trial court in her motion to correct errors. "Any claimed error not raised in the motion to correct errors before the lower court will be deemed waived on appeal. . . ." *Adkins v. Elvard* (1973), 155 Ind. App. 672, 675, 294 N.E.2d 160, 162. We therefore need not consider this issue.

The record discloses that Chain repeatedly testified that she signed stock transfers for 49% of the stock to James and Joan Finley. However, on cross examination, she was shown to have executed an affidavit in which she stated that she had been the record owner of all 1,000 shares of Tonopah, Inc. and that she had transferred 998 of the shares to James E. Finley and two shares to a Michael Baker. Mr. Finley had told her that two shares of the corporation stock must be owned by a six-month resident of the county where the tavern is located when a liquor permit renewal is requested, and neither he nor his wife so qualified. Both parties denied making the decision as to who was to receive the stock, and neither knew who did make the decision. Joan Finley testified that no stock of Tonopah, Inc. was ever transferred to her, and she never saw her husband receive any of the stock.

The question before this court is not whether Chain's failure to transfer the Tonopah, Inc. stock to Finley caused a rescission of the contract and a severance of Finley's liability under the contract.[3] The question is whether there is sufficient evidence to support a finding

---

3. Finley argues that a transfer of all the stock to others than herself amounted to a rescission of the contract as to her. However, in *Kentucky National Gas Corp. v. Indiana Gas & Chemical Corp.* (7th Cir. 1942), 129 F.2d 17, 19, the court said:

> Declaration of the vendor that he repudiates, rescinds or cancels does not of itself terminate the contractual relationship; for one party can not, by himself, do away with it. By his wrongful act he merely gives to his adversary an election [citation omitted] under which the purchaser may waive the vendor's repudiation.

Referring to waiver, the Seventh Circuit goes on to state that "[w]hen the term is used with reference to a breach, it includes giving up the right to treat the contract as discharged because of the breach of the adversary." *Id.*

The Finleys had not claimed that the contract was discharged. Neither did the Finleys bring an action for nonperformance, nor change their position in reliance on a rescission. To the contrary, they continued their payments under the contract, obtained renewal of the liquor permits in August 1971, and continued to operate The Paddock. Inasmuch as there was no agreement between the parties to rescind the contract, the contract was still in force and effect. However, the evidence indicates that Joan Finley may have acted as if there was no breach or offer of rescission because she did not know whether a breach had occurred. She never saw the transfers or any of the stock which was transferred. Cf. *French v. National Refining Co.* (1940), 217 Ind. 121, 26 N.E.2d 47. We need not reach the question whether her claim was preserved or waived, however, because we find evidence in the record to support a reasonable inference that the stock was transferred as required under the contract.

that the stock was transferred as required by the contract. The latter finding would preclude an argument that Finley was not a party to the contract at the time of the purchasers' breach, and would support the trial court's judgment of liability against Finley.

In determining whether the trial court's decision is supported by sufficient evidence, this court is not at liberty to weigh the evidence, but may only review the record for the limited purpose of ascertaining if there is any evidence which, if believed by the trier of fact, would sustain the judgment. A reversal of the trial court's decision for insufficiency of the evidence is warranted only if there is no substantial evidence of probative value to support that decision. *MacCollum v. American Fletcher National Bank and Trust Co.* (1972), 153 Ind. App. 282, 287 N.E.2d 265; *Clark Realty, Inc. v. Clarke* (1976), 171 Ind. App. 46, 354 N.E.2d 779.

We find that the record contains evidence sufficient to warrant a reasonable inference that Chain had transferred an interest in the Tonopah, Inc. stock to Joan Finley pursuant to the contract provisions.

## II.

Chain exercised her option and election within paragraph seven of the contract which provided that

. . . in the event of failure of the Buyers to make any of the payments, or any part thereof, or perform any of the covenants hereby made and entered into . . . this contract shall, at the option of the Seller, be forfeited and terminated.

. . .

In the event Seller's damages shall exceed the payments as made by Buyers, Seller may elect to maintain against Buyers the appropriate legal action to recover the excess in damages, and Buyers agree to pay to Seller in addition to Seller's actual damages all costs, attorney fees and other expenses proximately resulting therefrom. . . .

The evidence clearly indicates that the Finleys failed to make the payments after April, 1972, failed to pay property taxes, allowed the policy of casualty insurance for the real estate to lapse, failed to pay

obligations owed by Tonopah, Inc., and abandoned the contract[4] as well as the property.

The loss of the liquor permits was not a breach of any covenant within the contract. Paragraph six granted the buyers the option to elect to rescind the contract "[i]n the event the Indiana Alcoholic Beverage Commission should refuse to renew the Alcoholic Beverage Permits presently held by Tonopah, Inc., on the *next* application . . ." (emphasis added). In August 11, 1971, the *next* renewal permits were issued. Thereafter, the buyers' responsibilities continued under the contract.

We disagree with Finley's argument that the forfeiture provisions in paragraph seven could not be invoked and that Chain's only remedy was foreclosure consistent with the rule laid down in *Skendzel v. Marshall* (1973), 261 Ind. 226, 301 N.E.2d 641, cert. denied, 415 U.S. 921. In that case our Supreme Court held that "A forfeiture — like a strict foreclosure at common law — is often offensive toward concepts of justice and inimical to the principles of equity." But the Court went on to hold:

> This is not to suggest that a forfeiture is an inappropriate remedy for the breach of all land contracts. In the case of an abandoning, absconding vendee, forfeiture is a logical and equitable remedy. Forfeiture would also be appropriate where the vendee has paid a minimal amount on the contract at the time of default and seeks to retain possession while the vendor is paying taxes, insurance, and other upkeep in order to preserve the premises. Of course, in this latter situation, the vendee will have acquired very little, if any, equity in the property. However, a court of equity must always approach forfeitures with great caution, being forever aware of the possibility of inequitable dispossession of property and exorbitant monetary loss. We are persuaded that forfeiture may only be appropriate under circumstances in which it is found to be consonant with notions of fairness and justice under the law. (Emphasis in original).

261 Ind. at 240-241, 301 N.E.2d at 650.

---

4. This abandonment was not technically a rescission. Chain merely accepted the situation which the wrongdoing of the purchasers had brought about. *Kolling v. Martin* (1937), 103 Ind. App. 318, 7 N.E.2d 527.

These limited exceptions which permit forfeiture have been previously recognized by this court in *Tidd v. Stauffer* (1974), 159 Ind. App. 570, 308 N.E.2d 415; *Goff v. Graham* (1974), 159 Ind. App. 324, 306 N.E.2d 758; and *Donaldson v. Sellmer* (1975), 166 Ind. App. 60, 333 N.E.2d 862. In both *Goff* and *Donaldson*, forfeitures of land sale contracts were upheld and damages were granted on the basis of evidence showing: insurance coverage was not procured nor premiums paid, contract payments were not paid, and the purchasers committed waste on the premises. The evidence in the case at bar discloses similar facts: the purchasers failed to pay the monthly installments after April, 1972, they failed to obtain and pay for insurance, they failed to pay Tonopah's obligations to creditors, they abandoned the operation of the tavern business on the premises, and the premises sustained damages during their possession.

From the evidence, the trial court could reasonably infer that purchasers' lack of performance constituted a material breach (*see Goff, supra*), that a resumption of obligations by either purchasing party was unlikely, and that the Finley's were "abandoning, absconding vendee[s]".

Finley also urges us to consider that the amounts already paid have established a substantial equity in the purchasers. Where an "exorbitant monetary loss" will be occasioned by loss of possession and a forfeiture of payments, *Skendzel* cautions against the use of the forfeiture remedy. *Fisel v. Yoder* (1974), 162 Ind. App. 565, 320 N.E.2d 783; *Bartlett v. Wise* (1976), 169 Ind. App. 125, 348 N.E.2d 652.

The record lacks evidence indicating the actual amounts paid. However, assuming the payments were made as required until the breach, the down payment and the installment payments (beginning on June 17, and July 1, 1971, through April 1, 1972) which total $6,893.40, constitute 30.2 per cent of the $22,815.98 total to be paid to the seller and on the mortgage under the contract.

Under the circumstances of this case, we do not find forfeiture of such amount to be inconsistent "with notions of fairness and justice under the law." The contract was validly forfeited and terminated, and Chain rightfully instituted an action for damages.

## III.

Finley contends on appeal[5] that the damages claimed and recovered by Chain were not caused by any breach of the contract to sell stock, but may have been the result of James Finley's mismanagement of the tavern business. By this contention she appears to raise three issues. First, Finley argues that the damages were not the result of a breach of the contract and therefore may not be recovered in an action based on said contract. Secondly, she argues that the evidence does not support a finding of a causal relation between her actions and the claimed injuries. Thirdly, she argues that the damages could only accrue to the corporation and are not recoverable by Chain individually.

We find no merit in Finley's first argument. Chain was not limited to a single theory of recovery buy may recover under any theory that is sufficiently supported by facts pleaded in her complaint so that the defendant is placed on notice as to the evidence to be presented at trial. *Ayr-Way Stores, Inc. v. Chitwood* (1973), 261 Ind. 86, 300 N.E.2d 335; *see General Outdoor Advertising Co., Inc. v. LaSalle Realty Corp.* (1966), 141 Ind. App. 247, 218 N.E.2d 141. Chain's Complaint for Damages in Two Paragraphs contained facts sufficient for recovery under more than one legal theory.

Finley correctly asserts in her second argument that she may only be found liable to Chain on the contract for an amount of damages which can be said to be the natural and proximate consequences of the breach and which can be fairly said to have been contemplated by the parties as damages in case of a breach of the contract. *Schaffner v. Preston Oil Co.* (1927), 94 Ind. App. 554, 154 N.E. 780; *Anderson v. Western* (1974), 162 Ind. App. 453, 320 N.E.2d 759; *Jackson v. Stanfield* (1894), 137 Ind. 592, 36 N.E. 345, on petition for rehearing 137 Ind. 592, 37 N.E. 14.

The first of three categories of damages includes four items claimed by Chain, two liquor bills, a sewage bill, and the sales tax, which were obligations of Tonopah, Inc. incurred before termination of the contract

---

5. Although argued slightly differently each time, we find that through her motion to dismiss, objections at trial, motion to correct errors and briefs, Finley has preserved this issue for our consideration.

and which the Buyer agreed to pay. Under paragraph three of the contract, Finley agreed that " . . . Buyers assume and agree to pay all of the obligations of Tonopah, Inc. incurred for the purchase of inventory not delivered until after said date of transfer [of possession of physical assets of Tonopah, Inc.], and all other obligations of Tonopah, Inc. incurred thereafter." Further in paragraph four, the "Buyers [agreed] to pay that portion of the 1971 taxes, due and payable in 1972, prorated to date of the transfer of the physical assets of Tonopah, Inc. . . . ." Failure to pay these obligations constituted a breach of the contract and the amount of damages proximately resulting from this breach is the sum of said obligations, an amount equal to $2,043.98.

Finley argues that the evidence is insufficient to show she caused the obligations to remain upaid. However, the evidence that she told Chain she was going to take care of the sales tax, that she did the bookkeeping, and that she was the secretary-treasurer of the corporation, was sufficient to support the trial court's finding that she be held responsible for payment of these obligations.

A second category of damages includes Chain's expenses incurred in obtaining renewal of the liquor permits and the profits lost during the seven months the tavern could not be open for business. In an action for breach of contract, the only damages recoverable are all those proximately resulting from the promissor's breach. *Schaffner, supra; Vernon Fire & Casualty Insurance Co. v. Sharp* (1976), 264 Ind. 599, 349 N.E.2d 173. As stated above, failure to obtain renewal of the permits did not constitute a breach of contract.

Additionally, the record is devoid of evidence establishing the cause of the Finley's inability to procure the renewal. Damages may not be assessed against a party without proof that that party perpetrated the acts proximately resulting in the injury.

Under a tort theory, her action for the permit renewal expenses also fails. Before damages can be recovered, the loss must be brought upon the party complaining by a violation of some legal right. *Jones v. Lathrop-Moyer Company* (1934), 99 Ind. App. 127, 190 N.E. 883. Chain presented no evidence or argument describing a duty on the part of the Finleys to obtain the permit renewal, nor a right in herself which is affected by the loss of the renewal.

Even if, as it appears Chain claims, there existed a duty of ordinary skill and care to keep the business on-going, she presented no evidence of mismanagement or negligence, no evidence of the cause for the refusal to renew, nor any evidence that Finley was responsible for the discontinuance of the business. *See Peru Heating Company v. Lenhart* (1911), 48 Ind. App. 319, 95 N.E. 680. We find no basis for recovery of loss of profits or attorney's fees attributable to Chain's efforts to procure renewal of the liquor permits.

The final element of damages Chain claims is for injury to the tavern premises in an amount of $1,231.28 for repair of cold water faucets, a burned out cooler, a front door, and the cost of a discarded cigarette machine. The contract does not contain a promise or obligation to keep the premises in any particular condition. Thus, these costs do not proximately result from any breach of the contract to buy Chain's interest in the corporation and the realty.

Chain's remaining theory rests in tort, that is, for recovery of damages for waste to the premises. Waste is the destruction, misuse, alteration, or neglect of the premises by one lawfully in possession to the prejudice of an estate or interest therein of another. *Jowdy v. Guerin* (1969), 10 Ariz. App. 205, 457 P.2d 745, citing 56 Am. Jur. *Waste* § 2, p. 450 (1947); *Brugh v. Denman* (1906), 38 Ind. App. 486, 78 N.E. 349; *Biggs v. Bank of Marshfield* (1929), 90 Ind. App. 467, 473, 169 N.E. 71, 73 (Waste is "a threatened injury to the inheritance by one in lawful possession of the real estate. . . . 'The rightful possession of the wrongdoer is essential, and constitutes a material distinction between waste and trespass.' 4 Pomeroy Equity Jurisp. § 1348.").

No Indiana cases analyze the rights of a vendor, under an executory agreement to convey title on payment of the purchase money, to recover damages from his purchaser upon a waste theory.

Other authorities have often described the relation of this vendor to his purchaser by comparing it to the relation sustained by a mortgagee to his mortgagor. *Moses v. Johnson* (1890), 88 Ala. 517, 7 So. 146; *Miller v. Waddingham* (1891), 91 Cal. 377, 27 P. 750; *Small v. Slocumb* (1900), 112 Ga. 279, 37 S.E. 481; *Newman v. Mountain Park Land Co.* (1908), 85 Ark. 208, 107 S.W. 391; *McGregor v. Putney* (1908), 75 N.H.

113, 71 A. 226; *Crook v. Tudor* (1947), 28 Wash. 2d 289, 182 P.2d 740; *Conners v. Winans* (1924), 122 Misc. 824, 204 N.Y.S. 142; *Lewis v. Hawkins* (1874), 90 U.S. 119, 23 L.Ed.113; *see*: 8A G. Thompson, Commentaries on the Modern Law of Real Property, § 4449, Vendor and Purchaser, (repl. 1963); 77 Am.Jur.2d *Vendor and Purchaser* §§ 316, 359 (1975).

A mortgagor is regarded as the owner of the land for all purposes, while the mortgagee obtains the mortgage as security for a debt. *Knarr v. Conaway* (1873), 42 Ind. 260. The mortgage gives the mortgagee the right to bring an action to foreclose the equity of redemption and to recover a personal judgment on any agreements for payment and for an order of sale of the property to satisfy the mortgage. IC 1971, 34-1-53-1—3 (Burns Code Ed.).

Similarly, upon execution of a conditional contract for the sale of realty the purchaser becomes the equitable owner thereof, securing all the benefits and assuming all the risks of ownership, while the vendor retains the legal title as security for the purchase money. *Knapp v. Ellyson Realty Co., Inc.* (1937), 211 Ind. 180, 5 N.E.2d 973; *Skendzel, supra.*

In Indiana, the mortgagor who is in possession may exercise all acts of ownership, even to the committing of acts which might be considered waste, provided he does not "render unsafe the debts secured by the mortgage." *Knarr v. Conaway, supra* at 265; *Gray v. Baldwin* (1946), 8 Blackf. 164; *McCormick v. Digby* (1846), 8 Blackf. 99; Thus, the mortgagor has a duty not to commit such waste. *Berns Construction Co., Inc. v. Highley* (7th Cir. 1964), 332 F.2d 240.

In *Skendzel*, our Supreme Court recognized the similarity between a vendor-purchaser relationship and that of the mortgagee-mortgagor:

> [A] land contract, once consummated constitutes a present sale and purchase. The vendor " 'has, in effect, exchanged his property for the unconditional obligation of the vendee, the performance of which is secured by the retention of the legal title.' " *Stark v. Kreyling, supra*, 207 Ind. at 135, 188 N.E. at 682. The Court, in effect, views a conditional land contract as a sale with a security interest in the form of legal title reserved by the vendor. Conceptually, therefore, the retention of the title by the vendor is the same as reserving a lien or mortgage. Realistically, vendor-vendee

should be viewed as mortgagee-mortgagor. To conceive of the relationship in different terms is to pay homage to form over substance. See *Principles of Equity*, Clark, 4th edition, Sec. 9, p. 23.

301 N.E.2d at 646.

In Indiana, the vendor has an interest in real property which is analogous to that of a mortgagee. Based on *Knarr*, *Gray* and *McCormick*, the purchaser in possession, as with the mortgagor in possession, will not be enjoined from his use and enjoyment of the property purchased under a land sale contract until such use threatens to render unsafe the security for the remaining debt.

Having recognized this right in the purchaser, as owner, to use and enjoy the property, we may not then hold him liable in damages for waste to the real estate unless the consequences of his actions injure such a part of the property so as to have rendered the remaining debt insecure.

The difficult determination of whether the security of the contract debt was impaired, and the resolution of the amount of damage sustained, are for the trial court.

On the other hand, where the debt is extinguished through a forfeiture or foreclosure, such a margin is unnecessary to cushion a risk that no longer surrounds the security.

In the present case, the debt secured by the realty is the amount owed under the contract for the purchase of Chain's equity in the real estate. This debt was extinguished when Chain terminated the contract and repossessed the premises on June 6, 1972. Thus, the value of Chain's security interest, or her vendor's lien, fixed at that date, equals the remaining debt still owed to the bank.

Measurement of the damages may differ according to the parties' circumstances. In a case where the mortgage foreclosure proceeding is mandated under *Skendzel*, the foreclosure price might reflect a decrease in market value wholly caused by the waste committed on the premises. If the waste had reduced the value of the property to less than the amount of the debt, the damages recoverable for waste would be equivalent to the amount recoverable by a mortgagee as a

deficiency judgment. Where a forfeiture is appropriate, the purchaser who loses all his equity is penalized where his lost equity is greater than the damages sustained.

Because Indiana has adopted the lien theory to describe the vendor's interest, in each case, the trial court must determine the extent of reduction in the value of the security interest in the property, not just the amount of injury to the real estate.[6]

In the case at bar, the record discloses that in consideration of Chain's equity in the real estate, the Finleys paid $1,000.00 upon execution of the instant land contract, and they agreed to pay the remaining unpaid balance of $9,815.98 dollars on Chain's existing mortgage, which had an initial value of $12,000.00. There is no evidence of the value of the real estate, which is necessary to determine the value of the property securing the debt, and there is no evidence of the amount already paid under the contract to the prior mortgagee, the First National Bank in Wabash, for computation of the remaining debt secured in the contract.

Upon remand for further findings on damages for waste, the trial court should determine whether the value of the realty had been reduced to the extent that the remaining debt was rendered unsafe.

We have established the considerations for a determination and the computation of the vendor's right to damages for waste under a land sale contract, and the purchaser's duty to refrain from committing waste on the property. We must next consider this particular purchaser's liability for the damages claimed.

Chain has the burden to prove that, by her conduct, Finley violated her duty to the vendor and caused waste to the premises. *See Merritt*

6. In some jurisdictions the mortgage is conceptualized as a conveyance of defeasible title to the mortgagee. In these mortgage title theory jurisdictions, as in situations in Indiana involving the landlord-tenant relationship, or the life tenant, remainderman reversionary interests, remedies against waste arise when the damage lessens the value of the plaintiff's estate. *Dawson v. Coffman* (1867), 28 Ind. 220.

The measure of damages has not always been confined to the depreciation in the value of the land by reason of the waste. Where the value of damaged property, or the value of any other injury done to the premises furnished a greater value for the injury done, the courts had a right to adopt it. *Knisely v. Hire* (1891), 2 Ind.App. 86, 28 N.E. 195.

*v. Richey* (1891), 127 Ind. 400, 27 N.E. 131. The evidence in the record most favorable to the trial court's decision indicates that Finley held a bartender's license and she worked in the tavern as a barmaid and waited tables from June, 1971, until the end of March, 1972. The shareholders of Tonopah, Inc. elected her a director and to the office of secretary-treasurer. Some business papers of the corporation had been signed by her as secretary, and she did the corporation's bookkeeping. She was aware that Jim Finley had sold the cigarette machine. When she and Jim Finley were in business, they called handyman almost daily to fix the bathroom faucets which were often broken by patrons. After March, 1972, when she discontinued working at The Paddock, she made no effort to continue the business or to see to the repair of the premises.

Conduct resulting in passive, as well as active, waste may injure or threaten property rendering the debt unsafe.[7] Permissive waste results from negligence or omission to do that which would prevent injury. *Jowdy, supra; see Gleason v. Gleason* (1909), 43 Ind. App. 426, 87 N.E. 689; *Ferguson v. Stafford* (1870), 33 Ind. 162. To the extent damage resulting from permissive waste diminishes the value of the security, a vendor under a conditional land sale contract may recover.

There was sufficient evidence from which the trial court could reasonably infer that Joan Finley could have had the faucets repaired but instead neglected to take care of the business and removed herself from any concern for the condition of the premises. Because the trial court could reasonably infer that Finley's failure to care for the premises proximately caused this injury, we find that the damages for this item were not too remote and will be allowed to the extent the trial court finds such damages have injured Chain's security interest. There is no evidence, however, to explain how, or when, the cooler broke, why the front door needed repair, or in what manner the conduct of either

---

7. The discussion in *Camden Trust Co. v. Handle* (1942), 132 N.J. Eq. 97, 26 A.2d 865, presents a contrary holding, based on a study of early English landlord-tenant law. We see no logical or practical reasons for support of such a rule. *See Leipziger, The Mortgagee's Remedies for Waste*, 64 Cal. L. Rev. 1086 (1976); Denton, *Right of a Mortgagee to Recover Damages from a Third Party for Injury to Mortgaged Property in Ohio*, 3 Ohio St. L.J. 161 (1937).

Joan or James Finley (or any other force for that matter) caused these particular damages. We find that the trial court erred in granting recovery of expenses associated with the cooler and the front door.

In her final argument, Finley contends that Chain may not recover individually for injuries which she characterizes as sustained by the corporation.

We find her argument correctly applies only to the claim for damages from the loss of the cigarette machine. The record lacks any evidence demonstrating a personal right or interest, belonging to Chain in the personal property located on the premises. On the contrary, it appears that the assets owned by the corporation consist of such personal property, including the cigarette machine. Chain may not sue individually for a loss sustained by the corporation, and she may sue derivatively only if she is a stockholder. *Tevis v. Hammersmith* (1929), 31 Ind. App. 281, 66 N.E. 912, affirmed, 161 Ind. 74, 67 N.E. 672. There is no evidence to indicate Chain's intention or ability to sue on behalf of the corporation.

The corporation was not a party to this contract. Therefore, neither Chain nor Finley was obligated to the corporation under the contract. The responsibility for paying obligations incurred by Tonopah, Inc. was personally assumed by the buyers under paragraph three of the contract (quoted above). Chain may recover a personal judgment against Finley thereunder in reimbursement of debts she paid.

The tort claim is against the purchasers who were in possession of the realty. The parties' tort liabilities were based on duties owed to one another as vendor and purchaser. The corporation had no interest in the realty and, therefore, had no claim for injury to it.

In summary, we (1) affirm the judgment as to damages granted for Finleys' failure to pay obligations and taxes under the contract and which Chain paid in the amount of $2,043.98, (2) reverse the judgment as to damages granted pertaining to the three-way liquor permit renewal attempts by Chain subsequent to her repossession, (3) remand for further findings by the trial court concerning the value of the secured property, the amount of debt remaining, whether the damages to the premises (which were upheld herein) injured Chain's security

interest and, if so, the amount of damages Chain may recover for such waste.

Lowdermilk and Lybrook, JJ., concur.

NOTE—Reported at 374 N.E.2d 67.