Terry HUBER and Julie A. Huber, Appellants–Plaintiffs and Counter–Claim Defendants,

v.

Danny W. SERING and Sheila M. Sering, Appellees–Defendants and Counter–Claim Plaintiffs.

No. 54A01–0604–CV–162.

Court of Appeals of Indiana.

June 8, 2007.

Hubers contend that the remedy of forfeiture was inappropriate in these circumstances because they had paid a substantial amount toward the purchase price of the property. Moreover, the Hubers maintain that because the land sale contract was terminated and the Serings retook the property and subsequently sold it to another individual, the Serings were not entitled to retain the payments that the Hubers had made toward the purchase price. Moreover, the Hubers argue that they are entitled to a judgment from the Serings in the amount of $25,600 in light of an erroneous appraisal of the property that had been admitted into evidence. Concluding that forfeiture was proper in these circumstances, we affirm the judgment of the trial court.

## FACTS

The Serings owned approximately forty-seven acres of land in Montgomery County. The property was undeveloped, located off a county road, and was comprised of woods, a small piece of tillage, and a pasture. An abandoned, collapsing sawmill was the only structure on the property.

Sometime in 1999, the Hubers approached the Serings about purchasing the property under an installment contract. The Serings indicated an interest in parting with the property for a straight "cash-and-title sale." Appellants' App. p. 142. Terry represented that he was self-employed, and he informed the Serings that his payments would be sporadic and possibly late. Pursuant to an oral agreement, the Hubers offered to demolish the abandoned sawmill on the property at no cost and to perform forty hours of backhoe work in addition to paying approximately $2200 per acre for the land. They also offered to make a $20,000 down payment toward the purchase price.

James E. Ayers, Wernle, Ristine & Ayes, Crawfordsville, IN, Attorney for Appellants.

Ian McLean, Goebel & McLean, PA, Crawfordsville, IN, Attorney for Appellees.

## OPINION

BAKER, Chief Judge.

Appellants-plaintiffs Terry and Julie Huber (collectively, the Hubers) appeal the trial court's judgment in favor of appellees-defendants Danny and Sheila Sering (collectively, the Serings), seeking to set aside the judgment of forfeiture regarding the Serings' real estate. Specifically, the

Before the execution of a written agreement, the Hubers paid $2000 toward the down payment in November 1999. Although the Hubers wrote a check for an additional $5000 in December 1999, the check was returned for insufficient funds. However, Terry wrote a subsequent check for $5000 and noted that it was "replacing check No 699." *Id.* at 245. Although that check cleared, a subsequent check in the amount of $8000 was returned for insufficient funds in February 2000.

On February 11, 2000, the parties executed a land sale contract (the contract) for the purchase of the property. The total purchase price was $103,666.20, or approximately $2200 per acre plus interest. The contract required the Hubers to make a down payment of $15,000 and monthly installment payments of $2239.38, due on the first day of each month, commencing on March 1, 2000. The contract also provided for a late fee of $40 per day if the payment was more than ten days delinquent. The down payment that the Hubers had tried to pay in February was ultimately made in May 2000.

Under the terms of the contract, the Hubers were required to pay all real estate taxes and municipal assessments. They also were to provide insurance coverage for any improvements on the property. In the event that the Hubers did not comply with these provisions, the contract provided that the Serings would pay the costs and add that amount to the contract balance. The default provision under the contract defined an "event of default" as

a default by purchaser for a period of tens [sic] (10) days in payment of (i) any installment of the Purchase Price when due under the terms of this Contract, (ii) any installment of real estate taxes on the Real Estate or assessment for a public improvement which by the terms of this Contract are payable by the Pur-

chaser, or (iii) any premium for insurance required by the terms of this Contract to be maintained by the Purchaser ... (b) Default for a period of ten (10) days after written notice ... in the performance or observation of any other covenant or term of this Contract.

*Id.* at 20–21. It was agreed that if a payment was late, the Serings could demand immediate payment of all sums due or to become due under the contract "without any notice, presentment, demand, protest, notice of protest, or other notice of dishonor or demand of any kind, all of which are hereby expressly waived by [the Hubers]." *Id.* at 253. Moreover, the contract contained a forfeiture clause, which provided that

In the event Purchaser deserts or abandons the Real Estate or commits any other willful breach of this contract which materially diminishes the security intended to be given to Vendor under and by virtue of this Contract, then, it is expressly agreed by Purchaser that, unless Purchaser shall have paid more than ... $25,000 of the Purchase Price, Vendor may, at Vendor's option, cancel this Contract and take possession of the Real Estate and remove Purchaser therefrom, or those holding or claiming under Purchaser without any demand and to the full extent permitted by applicable law.

*Id.* at 254.

Finally, the contract provided separately for the execution of a quitclaim deed, in advance, to be held by Security Abstract & Title Company as escrow agent for the parties. This provision stated:

The Purchaser has consented to execute a quitclaim deed to the Vendor. Such quit claim deed is not to be delivered to the vendor, but is to be held by Security Abstract & Title Company as Escrow agent for the parties. Should the Pur-

chaser breach under this contract, and said breach has been confirmed by the escrow agent, escrow agent shall deliver said deed to Vendor for recording.

*Id.* at 23.

At the closing in February 2000, the Hubers promised to complete the down payment in April, but they failed to do so. The Hubers did, however, make a payment in June 2000—ten days after the deadline set forth in the contract. The Hubers also made a late payment in August 2000, but they did not pay the accrued late fees, assessments, or tax installments that became due on the property after the contract was signed.

At some point, the Hubers informed the Serings that they would not honor the agreement to tear down the sawmill or perform the backhoe work. However, the Hubers promised to pay the Serings $1600 to hire someone else to do the work. Although another individual did the work, the Hubers never reimbursed the Serings.

In the fall of 2000, the Serings informed the Hubers that they would no longer tolerate defaults under the contract and that further breaches would be referred to their attorney, Stoney McGaughey. The Hubers then bounced a check when making the October 2000 payment.

On November 9, 2000, Terry was arrested after Julie had him "picked up on a mental health hold." *Id.* at 56. At the time of his arrest, Huber apparently had the cash in his pocket to pay the Serings. Prior to Thanksgiving, Julie contacted the Serings and informed Danny that her husband was in custody and that she could make the November payment. However, Danny told her that it was too late and that they were taking back the land. While Terry's brother also spoke with the Serings about making the payment, Danny told him that a quitclaim deed to the property was going to be recorded as permitted in the contract.

On November 15, 2000, McGaughey sent a certified letter to the Hubers accelerating the debt and declaring the contract to be payable in full immediately. The letter was returned "unclaimed" after three notices were sent on November 17, November 30, and December 2. *Id.* at 90–91, 265, 435. The contract provided that all notices to the Hubers were to be "deemed sufficiently given" when mailed to "8524 E. County Road 1350 North, Ladoga, IN, 47954." *Id.* at 255. The Hubers could effect a change of address if they notified the Serings in writing. However, the Hubers never notified the Serings of any other address and McGaughey sent the letters and notices to address specified in the contract.

On November 25, 2000, the Serings spoke with McGaughey about the defaults under the contract. They agreed that McGaughey would wait a couple of days and then send a letter notifying the Hubers that the Serings would retake the property by recording the quitclaim deed. On November 27, 2000, McGaughey sent the following letter to the Hubers:

I regret to inform you, that since you have chosen to ignore your obligations under the land contract, and continue in breach, I have been directed by Mr. & Mrs. Sering to record the Quitclaim deed, which terminates all your interests under the land contract. Although over $3,000 is still owed through the date of breach, [the Serings] have agreed to forgive this amount, provided that all goes smoothly. Please remove all of your personal property from the real estate, and surrender possession immediately.

*Id.* at 270. After receiving no response from the Hubers, the Serings recorded the quitclaim deed on November 30, 2000. In December 2000, Terry telephoned Danny

and informed him that they were not permitted to retake the property. However, the Hubers did not offer to cure the default under the contract.

The Serings heard nothing more from the Hubers until January 2001, when McGaughey received a letter from Julie's legal counsel, James Holder. That letter indicated that the Hubers were involved in divorce proceedings and that Julie believed that she and Terry had "surrendered their interest in [the] property." *Id.* at 441. In response, McGaughey noted that he had been contacted by Terry's attorney as well and recounted the Serings' position that the contract had been terminated in light of the Hubers' breach.

On April 20, 2001, the Hubers' marriage was dissolved. Pursuant to the final decree, a commissioner was appointed and Terry was ordered to sell all of the parties' assets and divide the proceeds. The decree also ordered the Hubers to submit lists "setting forth the known and/or suspected location of each asset." *Id.* at 418. Julie submitted her list on May 3, 2001, but it did not contain any reference to the Serings' property. While Terry had previously petitioned the dissolution court for an order to protect the parties' marital assets, his list did not mention the property.

Following the dissolution, Terry's attorney, Sid Tongret, contacted McGaughey. Tongret asserted that the termination of the contract was illegal and that a foreclosure action would have to be commenced to regain possession of the land. After McGaughey consulted with the Serings, they agreed to allow Terry to purchase the land for a single cash payment of the amount due under the contract, including all late fees.

After hearing nothing from Terry, the Serings placed the property on the market for sale for one year after they recorded the quitclaim deed. They received an offer of $1500 per acre, which they rejected. However, on May 30, 2002, the Serings sold the property to James and Elizabeth Tucker. The land was sold for $100 more per acre than what the Serings and the Hubers had agreed upon. Sometime thereafter, Terry contacted the Serings and was informed that the property had been sold. In response, Terry stated, "you wasn't allowed to sell that, we still own that property." *Id.* at 164.

As a result, on June 2, 2004, the Hubers filed a complaint against the Serings, seeking to "set aside the quitclaim deed and either cause Defendants to reinstate the contract or cause the real estate to be sold as provided for Mortgage foreclosures." *Id.* at 12. The Hubers asserted that they were entitled to receive "all proceeds beyond any debt owed [the Serings] under the contract." *Id.* at 13. Additionally, because the Hubers alleged that the Serings "made false, written representations to acquire a property interest," they claimed entitlement to "judgment for such false representations, for damages equal to three times the loss to Plaintiffs, together with attorney's fees, expenses and costs in accordance with I.C. 34–24–3–1." *Id.* at 12.

In response, the Serings filed a counterclaim against the Hubers, alleging that the Hubers had defaulted on their obligations under the contract because they had failed to make the November 2000 payment by the due date. They also asserted that the Hubers owed late fees in the amount of $2280. Thus, the Serings requested a declaratory judgment that "the rights of the Hubers under the Contract and in and to the Real Estate are forfeited due to their default and failure, upon demand, to cure their default." *Id.* at 29.

Following a bench trial that concluded on January 6, 2006, the trial court entered judgment for the Serings. The trial court issued findings of fact and conclusions of law on March 22, 2006, which provided in relevant part that:

> The Land Contract between the Hubers and the Serings provided for termination of the Hubers' contract rights upon their default. The contract further provided that the Serings could retain all amounts paid by the Hubers, upon cancellation of the contract as an "agreed payment for the [Hubers'] possession of the Real Estate prior to default" unless [the] Hubers had paid more than $25,000.00 of the purchase price. Hubers defaulted under the terms of the contract when they failed to pay the contract payment due in November, 2000. At the time of this default, Hubers owed Serings $83,489.37 of the purchase price of $103,666.20. Further, Hubers were in default under the contract for failure to purchase liability insurance coverage for the real estate as required by the contract.[1] Upon Hubers['] failure to pay in November, 2000, Serings sent notice to the Hubers on November 15, 2000 that they were declaring the contract payable in full immediately. Final notice was sent by the Serings to the Hubers on November 27, 2000 that they were terminating the contract by recording the Quitclaim Deed from Hubers releasing their rights in the real estate to the Serings.

Forfeitures are generally disfavored by the law. In *Skendzel v. Marshall*, 261 Ind. 226, 301 N.E.2d 641 (1973) the Indiana Supreme Court emphasized that forfeiture is rarely as effective a remedy as foreclosure. However, the *Skendzel* court noted that forfeiture would be appropriate when a buyer has paid a minimal amount on the contract and seeks to retain possession when the seller is paying taxes, insurance and upkeep to preserve the premises. *Skendzel*, 261 Ind. at 241, 301 N.E.2d at 650. Under a typical conditional land contract, the vendor retains legal title until the total contract price is paid by the vendee. The court, in effect, views a conditional land contract as a sale with a security interest in the form of legal title reserved by the vendor. Conceptually, therefore, the retention of the title by the vendor is the same as reserving a lien or mortgage. Realistically, vendor-vendee should be viewed as mortgagee-mortgagor. To conceive of the relationship in different terms is to pay homage to form over substance. *Skendzel*, 301 N.E.2d at 646.

Judicial foreclosure of a land sale contract is in consonance with the notions of equity developed in American jurisprudence. A forfeiture—like a strict foreclosure at common law—is often offensive to American concepts of justice and inimical to the principles of equity. This is not to suggest that a forfeiture is an inappropriate remedy for the breach of all land contracts. In the case of an abandoning, absconding vendee, forfeiture is a logical and equitable remedy. Forfeiture would also be appropriate where the vendee has paid a minimal amount on the contract at the time of default and seeks to retain possession while the vendor is paying taxes, insurance, and other upkeep in order to preserve the premises. Forfeiture may only be appropriate under circumstances in

---

1. As an aside, we note that the terms of the land sale contract provided that the "purchaser agrees to procure and maintain fire and extended coverage insurance with a responsible insurer *upon all improvements on the Real Estate*." Appellants' App. p. 16 (emphasis added).

which it is found to be consonant with notions of fairness and justice under the law.

. . .

When faced with contract provisions calling for forfeiture of the portion of the purchase price paid prior to a buyer's default, the court must determine whether such provisions are enforceable as liquidated damage clauses or unenforceable as a[n] equitable forfeiture provision. In *Skendzel,* the court ultimately applied equitable principles comparing the amount paid by the buyers ($21,000.00) to the total contract price ($36,000.00) to conclude that forfeiture in that case would have been "inconsistent with generally accepted principles of fairness and equity." *Id.* at 647. The result was a remand to the trial court for the sellers to proceed with a foreclosure of the contract rather than the forfeiture originally sought.

In the present case, the contract has been terminated, possession of the real estate has been returned to the Serings, and ultimately sold to a third party, and payments totaling $20,176.83 have been retained by the Serings for the damages they suffered. The issue is not whether a foreclosure should now take place, but whether the forfeiture of Hubers' equity under the contract should be upheld. In this case, the buyers' equity is defined as being the amount by which the value of the property exceeds the liens and charges against it.

The contract at issue here was in effect for only nine (9) months at the time the cancellation occurred, and Hubers had paid less than 20% of the total purchase price. The Hubers had consistently been late with their contract payment and had tendered non-sufficient funds checks to Serings on four (4) separate occasions. The Hubers had further failed to insure the real estate as required contractually, nor had they demolished the sawmill and cleaned up the debris. Mr. Huber also failed to perform certain backhoe work for the Serings that was promised as a condition of purchasing the real estate on contract rather than for cash. Serings suffered damages of $1600 as a result of Mr. Hubers' breach of this oral agreement when they were required to hire another person to perform the work.

Further, the evidence in this case shows that the subject real estate had a value of $1,700.00 per acre or $80,105.70 in November of 2000. Thus, when the Serings reacquired title to the real estate, they obtained a property worth $3,383.67 less than the amount then owed to them by Hubers under the contract. The buyers, therefore, had no equity under the contract for the law to protect.

Applying the principles set forth in *Skendzel* to this case, the court finds that forfeiture was an appropriate remedy and that the provision allowing Serings to retain $20,176.83 in contract payments was reasonable and enforceable as a liquidated damage provision. As such, it is binding upon both parties and neither should prevail on the clam or counterclaim in this cause.

*Id.* at 450–52. The Hubers now appeal.

### DISCUSSION AND DECISION
#### I. *Standard of Review*

 At the outset, we note that the trial court entered findings of fact and conclusions thereon on its own motion. Sua sponte findings control only as to the issues they cover. *Whalen v. M. Doed, LLC,* 859 N.E.2d 368, 371 (Ind.Ct.App. 2007), *trans. denied.* A general judgment will control as to the issues upon which

there are no findings. *Yanoff v. Muncy,* 688 N.E.2d 1259, 1262 (Ind.1997). "A general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence." *Id.*

When a trial court has made findings of fact, we review the sufficiency of the evidence using a two-step process. *Id.* First, we must determine whether the evidence supports the trial court's findings of fact. *Id.* Second, we must determine whether those findings of fact support the trial court's conclusions of law. *Id.* We will set aside the findings only if they are clearly erroneous. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Id.* "A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts." *Id.*

In applying this standard, we neither reweigh the evidence nor judge the credibility of the witnesses. *Pitman v. Pitman,* 721 N.E.2d 260, 263–64 (Ind.Ct. App.1999). Rather, we consider the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. *Id.* To make a determination that a finding or conclusion is clearly erroneous, our review of the evidence must leave us with the firm conviction that a mistake has been made. *Yanoff,* 688 N.E.2d at 1262. "To the extent that the judgment is based on erroneous findings, those findings are superfluous and are not fatal to the judgment if the remaining valid findings and conclusions support the judgment." *Lasater v. Lasater,* 809 N.E.2d 380, 397 (Ind.Ct.App.2004).

Finally, we note that the Hubers are appealing from a negative judgment. Thus, the Hubers must demonstrate that the trial court's judgment is contrary to law. A judgment is contrary to law only if the evidence in the record, along with all reasonable inferences, is without conflict and leads unerringly to a conclusion opposite that reached by the trial court. In conducting our review, we cannot reweigh the evidence or judge the credibility of any witness, and must affirm the trial court's decision if the record contains any supporting evidence or inferences.

*Infinity Prods., Inc. v. Quandt,* 810 N.E.2d 1028, 1031 (Ind.2004).

## II. Application of Skendzel

The Hubers first contend that the judgment cannot stand because the trial court incorrectly determined that they had failed to pay at least $25,000 toward the purchase price. Therefore, they claim that the forfeiture clause in the contract—even if valid—was improperly applied in this case. As a result, the Hubers direct us to *Skendzel v. Marshall,* 261 Ind. 226, 301 N.E.2d 641 (1973), for the proposition that foreclosure, rather than forfeiture, was the appropriate remedy.

In *Skendzel,* the purchaser in an installment land contract made nine payments, which were often late and sporadic. Thereafter, the seller attempted to enforce a forfeiture provision in the contract. The trial court entered judgment against the plaintiffs on their complaint for forfeiture, but this court reversed, holding that when the purchasers made irregular and untimely payments on the property, there was no showing that the vendors waived their forfeiture rights under the contract.[2] However, our Supreme Court granted transfer and determined that a forfeiture in that case would be inequitable and punitive. *Id.* at 645. The *Skendzel* court observed that the seller had waived strict compli-

---

2. *Skendzel v. Marshall,* 289 N.E.2d 768, 771 (Ind.Ct.App.1972).

ance with the provisions of the contract by accepting overdue or irregular payments. Moreover, it was determined that by allowing the seller to utilize forfeiture provisions in these circumstances, the seller's ability to resell the real estate and retain the buyer's payments would amount to an unfair penalty rather than reasonable liquidated damages. *Id.* at 645, 646. Indeed, the *Skendzel* court recognized that a court "must always approach forfeitures with great caution, being forever aware of the possibility of inequitable dispossession of property and exorbitant monetary loss." *Id.* at 650.

In essence, the Hubers maintain that *Skendzel* stands for the proposition that forfeiture is appropriate only when the property has been abandoned or when the vendee has paid a "minimal amount" on the contract at the time of default and the breach occurs soon after the execution of the agreement. The Hubers point out that the buyer likely would have very little or no equity in the property in those circumstances and, therefore, the trial court may hold that forfeiture serves as a liquidated damages clause. The Hubers maintain that they had paid more than 25% of the purchase price and that the only finding of "damages" was that the Serings had to pay $1600 to someone else to perform backhoe work that the Hubers had promised to do as part of the consideration for the purchase.

In further support of their argument that forfeiture was improper, the Hubers direct us to a number of cases where the *Skendzel* rule was considered. In *Morris v. Weigle,* the buyer entered into a contract with the seller for the purchase of a farm. The buyer made approximately 29.7% of the payments before the seller declared the buyer to be in default and sought forfeiture. 270 Ind. 121, 383 N.E.2d 341, 342 (1978). Our Supreme Court reversed the trial court's finding that forfeiture was appropriate and that the buyer's payments of 29.7% of the purchase price could be considered liquidated damages. In essence, the *Morris* court determined that such an outcome was inequitable and punitive. *See id.* at 342.

In *Goff v. Graham,* 159 Ind.App. 324, 306 N.E.2d 758, 765 (1974), the buyer was required to make monthly payments to the seller in the amount of $562.62 over a twenty-year period. The purchaser had made a $1950 down payment and the seller had agreed to accept a $1420 promissory note for the remainder of the down payment on the contract price of $61,750. The buyer failed to make the additional down payment and never made a monthly payment. Moreover, the evidence showed that the property in question contained rental units and that the buyer had collected rent but had not paid the seller. As a result, it was determined that forfeiture was an appropriate remedy. *Id.* at 766.

Unlike the circumstances in *Goff,* the Hubers argue that they had paid a significant amount toward the purchase price. Specifically, the Hubers contend that the trial court's determination that they had paid only $20,176.83 under the contract was contrary to the evidence. In support of this proposition, the Hubers note that they made a $15,000 down payment and paid a total of $17,919.04 in eight monthly installments of $2239.88. Thus, the Hubers contend that they made a total gross payment of $32,915.04. Moreover, the Hubers maintain that the Serings continued to access the land during the entire contract period. Thus, while being able to farm the land, the Serings received payments from the Hubers totaling over $20,000. As a result, the Hubers contend that the Serings enjoyed a windfall of nearly $24,000 on the property.

■ Notwithstanding these claims, the evidence established that the Hubers breached numerous promises to make the required down payment amount. The Hubers blatantly disregarded warnings from the Serings' attorney by refusing to even discuss the payment of late fees and they consistently wrote "bad" checks. Appellees' Br. p. 15. Indeed, within 270 days of signing the contract, the Hubers repeatedly tendered bad checks to the Serings, breached their agreement to make monthly payments for four out of the eight months in which they made the payments, breached their agreement to perform and subsequently pay for $1600 of backhoe work, and breached the agreement to demolish the old sawmill. The Hubers tendered no payments on the contract after October 2000 and failed to pay taxes or assessments on the land. Moreover, they made no improvements to the property other than cutting down some thorn trees and placing them in a pile.

The Serings tolerated many breaches until they eventually declared the balance due under the contract. At that point, the Hubers had made eight payments of $2,239.88, totaling $17,919.04. Also, after many false promises, delays, and a warning from the Serings' legal counsel, the Hubers made the $15,000 down payment. Although the Hubers maintain that they paid much more under the contract than what the trial court found, we note that $6160 of the Hubers' total gross payment of $32,915.04 consisted of late fees that were occasioned by their own conduct. Therefore, by the time the Serings decided to call the contract balance due, the evidence supports the trial court's determination that the Hubers had paid only $20,176.83 toward the principal, with a contract payoff amount of $83,489.37. In other words, 80.5% of the purchase price was outstanding because the Hubers had paid only 19.5% of the price. Also, adding the

$1600 due for the Hubers' refusal to do the backhoe work—which the trial court did not even include in its findings—makes the resulting payoff $85,098.37. Hence, we reject the Hubers' claim that the forfeiture judgment was erroneous "because the loan balance subtracted from the purchase price equals $27,756.86." Appellant's Br. p. 20.

■ We acknowledge that the determination as to whether payments made toward a contract are minimal enough to allow forfeiture does not depend on a mere statistical formula, and the totality of the circumstances must be examined. See *Johnson v. Rutoskey,* 472 N.E.2d 620, 626 (Ind.Ct.App.1984) (holding that payments totaling $11,000 or 21.5% of the contract did not trigger the *Skendzel* minimum payment exception, notwithstanding the contract's $12,000 liquidated damages provision). However, in light of the circumstances discussed above, we believe that the Serings' retention of the Hubers' payments is likened to an amount of liquidated damages in accordance with *Time Warner Entertainment Co. v. Whiteman,* 802 N.E.2d 886, 893 (Ind.2004):

> The term "liquidated damages" applies to a specific sum of money that has been expressly stipulated by the parties to a contract as the amount of damages to be recovered by one party for a breach of the agreement by the other, whether it exceeds or falls short of actual damages.

Additionally, as this court observed in *Gershin v. Demming,* 685 N.E.2d 1125, 1127 (Ind.Ct.App.1997):

> In determining whether a stipulated sum payable on a breach of contract constitutes liquidated damages or a penalty, the facts, the intention of the parties and the reasonableness of the stipulation under the circumstances of the case are all to be considered.... Liqui-

dated damages provisions are generally enforceable where the nature of the agreement is such that when a breach occurs the resulting damages would be uncertain and difficult to ascertain.

The evidence at trial demonstrated that it took the Serings two years to resell the property after the Hubers had abandoned it in 2000. Given the rapidity and frequency with which the Hubers breached the contract, we cannot say that the trial court erred in finding that the amounts paid represented liquidated damages rather than an unconscionable forfeiture.

### III. Error in Computing Equity

The Hubers also claim that the judgment must be set aside because the trial court erred in determining that they had no equity in the property. In particular, the Hubers claim that the trial court erred in relying on an August 20, 2001, appraisal report from Farm Credit Services Midwest, which valued the property at $1702 per acre for a total value of approximately $80,000. In essence, the Hubers maintain that the trial court's use of this appraisal report was erroneous because it only valued the property as vacant farmland rather than as a residential site.

In support of this claim, the Hubers assert that they purchased the land as a home site. Indeed, they intended to build a residence on the property, and the Tuckers had, in fact, built a residence on the land by the time of trial. The Hubers point out that the appraisal report valued the property as vacant agricultural-grain farmland and did not consider any of the acreage as a residential building site. Appellants' App. p. 394. As a result, the Hubers contend that the appraisal was erroneous because residential building sites on the property were valued between $2084.52 and $2294.25 per acre, and

[w]hen the Serings did sell the property to [the] Tuckers less than eighteen

months after the Hubers defaulted[, t]hey actually sold the property for more than they would have received from the Hubers. To claim that the property experienced a whopping 23% reduction in value in less than one year, only to rebound by another 27.5% increase in value over the next eighteen months transcends the bounds of reasonable judgment.... It is clear that the fair market value of the property at its highest and best use was always $100,000 or more for residential purposes, not the Farm Credit Services $80,195.70 appraisal as mere farmland.

Appellants' Br. p. 22–23.

▮ In resolving this issue, we initially observe that the Hubers did not object to the admission of the appraisal report. In fact the parties stipulated to the admission of their exhibits, and testimony about the appraisal and its value was admitted into evidence absent any objection. Appellants' App. p. 65, 168. Therefore, the issue is waived. *Everage v. N. Ind. Pub. Serv. Co.*, 825 N.E.2d 941, 948 (Ind.Ct.App.2005) (holding that when a party fails to make a timely objection, he or she waives the right on appeal to assert that the admission of evidence was erroneous).

▮ Waiver notwithstanding, the Hubers have failed to show that the trial court erred in considering the appraisal report as proof that the land was worth $1702 per acre at the time that the contract payoff had reached $83,489.37. Indeed, Terry testified at trial that the land was "like pasture and woods and then part of farm ground." Appellant's App. p. 98. Moreover, even assuming—without deciding—that the appraisal report was problematic, the Serings placed the property on the open market during the year after the Hubers had failed to make any additional payments. During that period of time, the Serings received a bid of $1500 per acre.

*Id.* at 203. Thus, the property had a market value of either $70,650, as determined by an offer from a prospective purchaser, or $80,105.70, as determined by the appraisal. *Id.* at 167–70. Using the estimate of $70,650, that amount represents $12,839.37 less than what the Hubers owed on the contract. Moreover, the only other evidence offered about the value of the property was Terry's self-serving testimony that the land was worth $4200 per acre, which the trial court was free to reject.

As a result, regardless of which estimate is used to support the trial court's judgment, the Hubers owed more on the contract than the value of the property and there was no equity to "forfeit." Appellees' Br. p. 29. In essence, the effect of the Serings' receipt of a marginally better price for the property—several years after the Hubers abandoned the contract—rises to the level of speculation and evidentiary weight which the trial court was uniquely situated to resolve. Thus, we decline to set aside the trial court's judgment on this basis.

### IV. Principles of Equity

Finally, the Hubers argue that "equity demands reversal of the trial court's decision." Appellants' Br. p. 20. Specifically, the Hubers argue that judgment should have been entered in their favor because "unfortunate life circumstances" forced them "to default on the contract," the Serings continued to farm the land for their own gain during the contract period, and the Serings ultimately sold the land to another individual "for an amount greater than ... [what they] would have received from the Hubers." *Id.* For these reasons, the Hubers claim that the judgment must be reversed. On the other hand, the Serings maintain that the judgment entered in their favor was appropriate because the application of the doctrine of laches should have barred their claim.

In resolving this issue, we initially observe that "he who seeks equity must do equity." *Willig v. Dowell,* 625 N.E.2d 476, 484 (Ind.Ct.App.1993). In other words, we will not entertain a petition for equitable relief when the party requesting such relief refuses and fails to do equity on his part. *State ex rel. Jester v. Madison Circuit Ct.,* 487 N.E.2d 1307, 1308 (Ind.1986). Also, for the doctrine of laches to apply, the following three elements must be established: inexcusable delay in asserting a right, implied waiver from knowing acquiescence in existing conditions, and circumstances resulting in prejudice to the adverse party. *In re Geisler,* 614 N.E.2d 939, 940 (Ind.1993). The mere passage of time is insufficient to establish laches; rather, it must be shown that the delay was unreasonable. *Habig v. Bruning,* 613 N.E.2d 61, 65 (Ind.Ct.App. 1993).

In this case, the evidence demonstrated that the Hubers were aware of all of the facts necessary to commence litigation against the Serings in 2000. Moreover, the Hubers' attorney threatened to commence an action against them in October 2001. However, when the Hubers were offered the opportunity to redeem the property, they did nothing, and the Serings were without further payment. As a result, the Serings were eventually able to sell the property to another buyer. Under these circumstances, it is apparent that only when the Serings were unable to maintain a foreclosure suit under *Skendzel* did the Hubers re-emerge and begin to demand money for an alleged violation of their rights to be foreclosed on by the Serings. Because the Hubers knew that they could not obtain the property, they claimed that the only "relief" possible was the return of all the money that they eventually paid to the Serings.

The circumstances regarding the Hubers' delay in asserting claims that they

might have had against the Serings demonstrate an implied waiver arising from knowing acquiescence in the fact that to push this action before the Serings resold the property would force the Hubers either to redeem the property on the terms offered by the Serings or to risk a deficiency judgment when the Serings bid their indebtedness at a sheriff's sale. In essence, it is reasonable to infer that the Hubers' knowing delay foreclosed the Serings' rights under *Skendzel* to adjudicate the disposition of the Hubers' contract payments. Under these circumstances, we will not permit the Hubers to escape the consequences of their actions.

### CONCLUSION

In light of our discussion above, we conclude that the Hubers were not entitled to recover any money that they had paid to the Serings because they abandoned the contract after paying only a minimal amount toward the purchase price of the property. Moreover, the evidence supported the trial court's conclusion that the Hubers were not entitled to the value of any equity in the property because they had no equity at the time of their default. Finally, we conclude that the Hubers' unconscionable delays in pursuing their alleged claims against the Serings establish that they are not entitled to a judgment under principles of equity because they have failed to do equity.

The judgment of the trial court is affirmed.[3]

DARDEN, J., and ROBB, J., concur.

---

**3.** Because we have affirmed the trial court's judgment for the reasons discussed above, we need not address the Serings' contention that

---

the Hubers' action was barred under estoppel principles.