Pursuant to Ind. Appellate Rule 65(D),
this Memorandum Decision shall not be
regarded as precedent or cited before any
court except for the purpose of
establishing the defense of res judicata,
collateral estoppel, or the law of the case.



FILED
Sep 24 2014, 9:58 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**P. ADAM DAVIS**
Davis & Sarbinoff, LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEES:

**MATTHEW E. DUMAS**
Hostetter & Associates
Brownsburg, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| R. MYERS & ASSOCIATES, LLC and | ) | |
| ROBERT D. MYERS a/k/a ROB MYERS, | ) | |
| | ) | |
| Appellants-Defendants, | ) | |
| | ) | |
| vs. | ) | No. 29A02-1305-PL-449 |
| | ) | |
| ADPOINT, INCORPORATED, | ) | |
| JOEL HALL and MARY HALL, | ) | |
| | ) | |
| Appellees-Plaintiffs. | ) | |

APPEAL FROM THE HAMILTON SUPERIOR COURT
The Honorable Daniel J. Pfleging, Judge
Cause No. 29D02-1003-PL-365

**September 24, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Adpoint, Incorporated ("Adpoint") filed a complaint against R. Myers & Associates, LLC and Robert D. Myers a/k/a Rob Myers (collectively "Buyer") relative to Buyer's purchase of a business from Adpoint. Buyer counterclaimed against Adpoint, and it also filed a third-party complaint against Adpoint's two shareholders, Joel and Mary Hall ("the Halls"). Following a bench trial, the trial court issued findings of fact and conclusions thereon and judgment, which found in favor of Adpoint both on Adpoint's complaint and on Buyer's counterclaim, and which denied Buyer's third-party complaint against the Halls. Buyer raises five issues that we consolidate and restate as: whether Buyer's default was justified such that the trial court's findings of fact and conclusions of law thereon and judgment in favor of Adpoint and the Halls (collectively "Seller") are clearly erroneous.

We affirm and remand.

## FACTS AND PROCEDURAL HISTORY

In 2009, Adpoint was the owner and operator of a sign-making and printing business called Sign-A-Rama, with locations in Fishers, Indiana ("the Fishers Store") and another in Carmel, Indiana ("the Carmel Store"). The Halls were the sole shareholders of both stores; they purchased the Carmel Store in 2000 and the Fishers Store in 2006. In May 2009, Adpoint entered into an Asset Purchase and Sale Agreement ("Purchase Agreement"), agreeing to sell the Fishers Store to R. Myers & Associates, LLC ("Myers LLC"). Myers LLC paid a portion of the purchase price in cash, and Adpoint financed the balance of the purchase price via a Promissory Note ("Note") dated May 8, 2009, in the amount of $30,000.00. Robert D. Myers a/k/a Rob Myers ("Robert"), the sole

2

member of Myers LLC, executed the Note as a personal guarantor. Myers LLC executed a Security Agreement that same date.

Under the terms of the Note, Myers LLC was to pay Adpoint in monthly installments in the amount of $583.00. Beginning in January 2010, Myers LLC stopped making the monthly payments. The Note provided that, in the event of a default, Adpoint was entitled to declare the entire unpaid principal balance and all accrued unpaid interest immediately due and payable, plus late charges, attorney's fees and costs of collection. The Security Agreement granted Seller a security interest in all inventory, machinery, equipment, appliances, improvements, furniture, fixtures, and other tangible personal property then-owned or after-acquired by Buyer that was located on or used in connection with the Fishers Store, and it entitled Seller to declare the indebtedness secured by the Security Agreement due and payable and allowed Seller to enter the premises to take possession of the collateral.

In March 2010, Seller filed a complaint against Buyer for the breach of the Purchase Agreement and Note stemming from the sale of Adpoint's Fishers Sign-A-Rama business. Buyer counterclaimed against Adpoint alleging "breach of the same contract and for fraud" and brought a third-party complaint against the Halls alleging "the same claims[.]"[1] *Appellants' Br*. at 4. A five-day bench trial was held in July and September 2012. At trial, the Note and Purchase Agreement, including all schedules and attachments, were admitted into evidence by joint stipulation.

---

[1] Buyer's Appendix does not include a copy of its Answer, Counterclaim, or Third-Party Complaint, and those documents are not otherwise in the record before us.

3

In February 2013, the trial court issued findings of fact and conclusions thereon, determining that Seller was entitled to judgment on its complaint, including interest and attorney's fees.[2] The total judgment in favor of Seller and against Buyer was $86,595.43, which included attorney's fees, plus $8.85 in daily interest from September 6, 2012. The trial court also denied Buyer's counterclaim and third-party complaint. Buyer filed a motion to reconsider, correct errors, vacate and/or modify the judgment, which the trial court denied. Buyer now appeals. Additional facts will be supplied as necessary.

## DISCUSSION AND DECISION

The essential elements of a breach of contract action are the existence of a contract, a breach thereof, and damages. *McKeighen v. Daviess Cnty. Fair Bd.*, 918 N.E.2d 717, 721 (Ind. Ct. App. 2009); *Berkel & Co. Contractors, Inc. v. Palm & Assocs., Inc.*, 814 N.E.2d 649, 655 (Ind. Ct. App. 2004). In this case, no party alleges that a contract did not exist or that there is any ambiguity in the contract terms. When a court is called upon to interpret an unambiguous contract, it must give effect to the intention of the parties as expressed in the four corners of the document. *H & G Ortho, Inc. v. Neodontics Int'l, Inc.*, 823 N.E.2d 718, 726 (Ind. Ct. App. 2005). The unambiguous language of the contract is conclusive upon the parties to the contract and upon the courts. *Id.* Here, the trial court determined that Buyer breached the contract and Seller suffered damages. On appeal, Buyer argues that it was justified in ceasing to make payment to Seller and did not breach the Purchase Agreement. Consequently, it claims,

---

[2] We commend the trial court on the thoroughness of its Findings and Conclusions thereon, which greatly facilitated our appellate review.

4

the trial court erred when it issued findings of fact and conclusions thereon that found Buyer had breached the contract and Seller was entitled to judgment.

We begin by noting that, pursuant the parties' written requests, the trial court entered findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52. On appeal of claims tried by the trial court without a jury, the appellate court shall not set aside findings or judgment unless clearly erroneous. *Kesler v. Marshall*, 792 N.E.2d 893, 895 (Ind. Ct. App. 2003), *trans. denied*. First, we consider whether the evidence supports the findings, construing the findings liberally in support of the judgment. *Id.* Next, we determine whether the findings support the judgment. *Id.* A judgment is clearly erroneous when it is unsupported by the findings of fact and conclusions thereon. *Id.* In applying this standard, we will neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* at 895-96. Rather, we consider the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. *Id.* at 896. We must affirm the judgment of the trial court unless the evidence points incontrovertibly to an opposite conclusion. *Id.*

Initially, we recognize Seller's assertion that Buyer's brief, essentially in total, "fails to cite to the record or any authority to support [its] contentions and assertions." *Appellees' Br*. at 4. We do not entirely disagree. Buyer provided this court with a substantial amount of factual background and argument, but in many instances it fails to identify exactly which of the trial court's findings are unsupported by evidence or otherwise explain how the findings and conclusions thereon were erroneous. A failure in that regard results in waiver. Ind. Appellate Rule 46(A)(8). However, that said, we

5

prefer to decide cases on their merits and do so here. *Thacker v. Wentzel*, 797 N.E.2d 342, 345 (Ind. Ct. App. 2003).

Although Buyer asserts the general claim that the findings of fact and conclusions thereon are "unsupported by applicable law," the majority of its brief and argument consists of factual matters; thus, we proceed with our analysis on the basis that Buyer's actual claim is that the trial court's findings "ignore a majority of pertinent and undisputed facts," *i.e.*, the findings are not supported by the evidence. *Appellants' Br.* at 18-19. For purposes of organization and analysis, we divide Buyer's position, that their failure to pay was justified and that they did not breach the contract, into the following four arguments: (1) Seller failed to transfer certain assets that should have been considered assets included in the Purchase Agreement, in particular a Roland 5400 (printer) and QuickBooks bookkeeping software, and other computer software; (2) the HP5000 Printer, located at the Fishers store and transferred with the sale, was obsolete or otherwise defective and some computers lacked sufficient memory and did not function properly; (3) the financial representations and warranties that Seller made in the Purchase Agreement were not true, accurate, and complete such that Seller failed to provide full disclosure regarding the financial condition of the Fishers Store; and (4) Seller did not pay for snow removal at the Fishers Store that had occurred prior to the sale. We address each argument in turn.

## I.    Transfer of Assets

In support of its argument that Seller failed to transfer all assets, Buyer relies on portions of several of the transfer documents, such as Section 1.1 of the Purchase

Agreement. That Section, entitled "Transfer of Assets," provided that Buyer was purchasing the assets of the business, some of which were listed in that section, as well as "[a]ll other items of personal property of any kind, tangible or intangible, owned by any Seller and used in the operation of the Business." *Appellants' App*. at 76-77. Section 1.1 referred to assets set forth separately on Schedule 1.1(1), which specifically listed two pages of items by category and provided also for the transfer of "all Assets identified in the Transaction Documents and All Assets, including, but not limited to, equipment, furniture, inventory, used in the operation of the Business or any kind or nature whatsoever." *Id*. at 101-03.

The primary item that Buyer asserts should have been transferred to them was the Roland 5400, which is a digital printer that was at all relevant times located at the Carmel Store. Buyer's position with regard to the Roland 5400 is that when Seller operated the Carmel and Fishers Stores, prior to the sale at issue, the Fishers Store would utilize the Roland 5400 at the Carmel store to produce various printing jobs that could not be completed on the HP5000, and therefore, it should have been transferred as part of the sale because it was "used in the operation of the business," a term used in the Purchase Agreement. *Id*. at 77, 101.

On the subject of whether this piece of equipment should have been transferred, the trial court found as follows: the list of assets in the Purchase Agreement did not include the Roland 5400 printer (Finding 39); and the Roland 5400 was always located at the Carmel Store and was never located at the Fishers Store, and it was not an asset of the Fishers Store (Finding 40). *Id*. at 17.

7

It is undisputed that the Roland 5400 was not listed in Section 1.1 of the Purchase Agreement or in Schedule 1.1(1), which specifically listed the equipment, furniture, software and other inventory that was being transferred in the sale. Thus, we find the evidence supports Finding 39.

It is also undisputed that the Roland 5400 was always located at the Carmel Store, and thus that part of Finding 40 is clearly supported by the evidence.[3] In Finding 40, the trial court also found that the Roland 5400 was not an asset of the Fishers Store; Buyer argues that this was not supported by the evidence because the Roland 5400 was "used in the operation of the business" at the Fishers Store and thus constituted an "asset" of the Fishers Store.

In support of their position that the Roland 5400 was "used in the operation of the business," Buyer called as a witness at trial Jon Buran, a former employee who worked at the Fishers Store both for the Halls, for a year or so, and later as a store manager for Robert. Buran testified that over 80% of all digital printing jobs that came into the Fishers Store were for outdoor print jobs and that those projects were printed on the Roland 5400 at the Carmel Store because the HP5000 could not handle those jobs. Buran further testified, however, that most of the jobs that came into the Fishers store were not for digital printing, but were for cut vinyl projects or other types of printing jobs.

---

[3] Finding 40 also states that "Adpoint leases the Roland 5400 printer from a third party." *Appellants' App*. at 17. Neither party makes any specific argument regarding this finding, and Buyer has failed to satisfy its burden of establishing that that finding is not supported by the evidence. We note, however, that according to the record before us, the HP5000 was, at some point, leased, but prior to the sale in question was paid in full. *Tr.* at 385. While there was some discussion concerning whether a lease payment for the Roland 5400 printer would be considered an in-house cost, such as ink and paper would be, it was not clear whether that was a hypothetical inquiry. *Id*. at 703.

The Halls also testified at trial and explained that they used the HP5000 at the Carmel Store from 2000-2006, until they purchased the Roland 5400. Around that time, they also purchased the Fishers Store, and they moved the HP5000 to that location. They acknowledged that the Roland 5400 was sometimes used to complete printing jobs that originated at the Fishers Store, but the Roland 5400 was not required for the Fishers Store to function. That is, the production of some jobs could have been outsourced to any other vendor, such as Indy Imaging, and they sometimes were. Furthermore, Seller presented evidence that the Fishers Store paid the Carmel Store for the use of the Roland 5400; the use of the Roland 5400 was not simply part of the operation of the Fishers Store. At no time prior to the sale was it represented that the Roland 5400, a printer housed at the Carmel Store, would be transferred as part of the sale of the Fishers Store. We find that the evidence supports the trial court's Finding 40.

Buyer next argues that QuickBooks, a bookkeeping and accounting software program, which was located at the Carmel Store, but was used to track income and expenses for both the Fishers and Carmel Stores, was an asset of the Fishers Store and should have been transferred to Buyer as part of its purchase of the Fishers Store. Buyer argues that, as a result of it not being transferred in the sale, it had to purchase QuickBooks in 2009 for $212.02.

The trial court's findings with regard to QuickBooks are: the list of Assets being sold did not include the QuickBooks software (Finding 39); a version of QuickBooks software existed on a computer at the Fishers Store, which the Halls did not use, and it had been transferred to them by the prior owners of the Fishers Store (Finding 41); Myers

9

LLC purchased a new QuickBooks software program in June of 2009 at a cost of $212.02 (Finding 42); Adpoint used QuickBooks software to track expenses and cost of goods sold (Finding 98); and Mrs. Hall would enter sales data for both stores into the QuickBooks software system (Finding 100). *Appellants' App.* at 17, 23.

It is undisputed that the list of Assets in the Purchase Agreement and Schedule 1.1(1) do not include QuickBooks. At trial, Mr. Hall testified that Adpoint used QuickBooks software to track sales and expenses for both the Fishers and Carmel Stores, but that the QuickBooks software program that Seller used was located at the Carmel Store. *Tr.* at 43. Mr. Hall testified that, before the sale, he had shown to Robert that there was a version of QuickBooks at the Fishers Store, owned by the store's prior owner and not used by the Halls, and Hall told Robert that he could use it if he desired. *Id.* at 813. Robert testified at trial and agreed that Mr. Hall had told him prior to the sale that QuickBooks was not part of the assets of the sale, and that Mr. Hall had also told him that a version of QuickBooks existed at the Fishers Store, which had been used by a previous owner and that Buyer was welcome to use that after it purchased the Fishers Store. *Id.* at 279. Buyer has failed to identify evidence or otherwise establish that the trial court's findings on the subject of the QuickBooks software was not supported by the evidence or was clearly erroneous.

## II. Condition of Certain Equipment

Buyer maintains that some equipment and software was not in usable condition at the time of transfer and that Seller breached Section 2.6 of the Purchase Agreement, which states, in pertinent part, that Seller was transferring assets that "are operable

without defects, and are transferred along with Seller's warranty of merchantability, fitness for a particular purpose, operability, capacity and condition." *Appellants' App.* at 80; *Appellants' Br.* at 13.

In large part, Buyer's argument is that the HP5000 printer, located at the Fishers Store and transferred to Buyer as an asset of the sale, was obsolete and inoperable. Buyer claims that, as a result, it was required to purchase an Epson printer for $31,495.00. The trial court found: the HP5000 printer was an asset included in the sale of the Fishers Store (Finding 65); the HP5000 was usable and functioning on the date of the transfer of assets (Finding 66); ink and other supplies "are still available" for the HP5000 (Finding 67); and Myers LLC failed to establish that the HP5000 is an obsolete printer (Finding 68). *Appellants' App.* at 19.

Buyer called as a witness Jim Jones ("Jones"), who owned a company that was a Hewlett Packard authorized service and hardware provider. He testified that Hewlett Packard ("HP") stopped production of the HP5000 in 2002 and that parts and service were available for five years thereafter, but that after 2007, HP was no longer manufacturing parts for it. *Tr.* at 59. Upon cross examination, Jones agreed that "obsolete" was an HP term of art for use when a machine was being phased out and that the term did not mean that a printer was no longer useful. *Id.* at 67. Mr. Hall testified that a printer that was the "same" as the HP5000 was still being manufactured in 2010, although under another name, and that toner, ink, and parts were still being made for the HP5000, perhaps by companies other than HP, but which were available online. *Id.* at 44. As to the capabilities of the HP5000, Mr. Hall stated that the HP5000 was fully

11

capable of making digital prints and had a higher resolution than the Roland 5400. It could not, however, produce vehicle wraps, and it was not able to print on perforated film. There was conflicting evidence about whether the HP5000 prints were suitable for outdoor usage. In his testimony, Robert conceded he did not research the HP5000's capabilities prior the purchase of the Fishers Store. *Id*. at 328-29. Buyer has failed to establish that the trial court's findings with regard to the HP5000, namely that it was not obsolete and was functional at the time of the transfer, were unsupported by the evidence or were erroneous.

Buyer also claims that the Flexi Pro, Microsoft Office, Corel Draw, and Adobe Illustrator – software programs that were transferred to them – were pirated or unusable versions. As a result, Buyer claims, it was required to purchase an upgrade to the Flexi Pro software at a cost of $800.76 in January 2010 and new Microsoft Office software in March 2010 at a cost of $553.50. Buyer did not purchase additional or replacement Adobe software or Corel software.

In its Findings, the trial court determined that Microsoft Office, Adobe Illustrator, Flexi Pro, and the Corel software were all functioning properly upon execution of the Purchase Agreement (Findings 44, 46, 48, 50); Buyer's method of storage and organization "made it difficult to find the disks needed to load the various pieces of software when they were needed by [Fishers Store] employees[.]" (Finding 43); and under the terms of the Purchase Agreement, Buyer was to pay Seller $5,000.00 after the closing, but Buyer never paid that "retainage" to Seller (Findings 30, 31). *Appellants' App*. at 17-18.

12

The evidence reveals that during the transition from the Seller's ownership to Buyer's ownership, in or around May and June 2009, a representative of Sign-A-Rama was on site at the Fishers Store to assist with equipment set up and training and that Robert used the Flexi Pro software at that time and no mention was made of software not operating properly. In November 2009, five months after the June 2009 sale, Buyer's computers crashed, and it needed licenses for the software in order to reinstall those programs on the computers. At that time, Myers LLC notified Adpoint by letter that there were problems with the various pieces of software and licenses were missing. Adpoint maintained that it was all properly licensed and that Myers LLC had lost the licenses.

With regard to the licenses, Mr. Hall testified that when he sold the Fishers Store there was Flexi Pro software on the computer, which software came with his purchase of the store in 2006, and that it was functioning when he sold the store to Buyer in 2009. Mr. Hall stated that he left the license in a box at the Fishers Store when Adpoint sold it. With regard to Adobe, Mr. Hall stated that a version of it likewise came on the computer when he purchased the store, but that he bought an upgraded Adobe Illustrator program and left the license in the Fishers Store when Adpoint sold it. With regard to the Corel Draw software, Mr. Hall testified that he purchased it during his ownership of the Fishers Store and left the license in the boxes at the store. With regard to the Microsoft Office, Mr. Hall testified that some of the software was on the Fishers Store computers when he bought the store, others he purchased when he upgraded the computers, and that the licenses were left in boxes when he sold the Fishers Store. He conceded, however, that

the Microsoft Office licenses that he had possessed were for Indiana University software, which he was entitled to use as a teacher for Ivy Tech and Indiana Wesleyan. Employee Buran testified that during the time period that he worked for Robert at the Fishers Store, the disks for the software were in different boxes and the wrong or mismarked cases and were hard to find.

After Adpoint received the notice from Myers LLC in November 2009 that Buyer was having issues with software, Adpoint, in an effort to resolve the matter, provided Buyer with new software. Robert testified that Adpoint provided him with a pre-owned version of Flexi Pro software in November 2009. The evidence reflects that the pre-owned version of Flexi Pro software received in November 2009 was operational but that Myers LLC elected to improve it by purchasing an upgrade to the software in January 2010. Adpoint also provided a pre-owned version of Adobe Illustrator, new Corel Draw software, and new Microsoft Office software in or before May 2010. Robert stated that he returned the Microsoft Office software to his attorney because he had already purchased it in March 2010. Myers LLC kept and used the Corel Draw software and the Adobe Illustrator software.

While there may have been issues associated with the software after the purchase of the Fishers Store, Buyer has not established that any problems existed at the time of its purchase of the Fishers Store or that Seller failed to provide proper licensing for the software. Furthermore, as recognized by the trial court, Section 5.5(a) of the Purchase Agreement provides that, in the absence of fraud, no amounts shall be payable by Seller for breaches of representations or warranties unless the aggregate amount payable

14

exceeds $2,500.00. *Appellants' App.* at 20 (Findings 69, 70). Buyer expended less than that for its purchase of Microsoft, Flexi Pro and QuickBooks.

Buyer next alleges there were issues with the condition of the computers, namely that the memory components of the computers were inadequate, such that the computers were not working properly upon transfer. The trial court found that the computers were functioning properly upon the execution of the Purchase Agreement in June 2009, and that any computer repair costs were incurred during the work of the computer service technician (Findings 53, 56). *Id.* at 18.

The evidence supports the fact that the computers were operational upon transfer and during two weeks of on-site training by corporate Sign-A-Rama. In support of their position that the computers were not functioning, Buyer called witness David Skelly, whose job it was to sell and service personal computers. He had worked on the Fishers Store's computers in September and October 2009, after the sale at issue, and he testified that at that time they were running "very slow." *Tr.* at 79. He also replaced one or more hard drives, and in the process of doing so, certain software programs, or portions of them, were erased and had to be reinstalled, at which time Buyer encountered problems with the licenses of the software, as described previously. Upon cross-examination, Skelly agreed that the first time he worked on the computers was in September and he had no knowledge of the condition of the computers in May or June 2009, the time of the sale. He further conceded that Windows XP needed to be reinstalled in October because of a program he had run on the computer in September. Buyer also presented the testimony of employee Buran, who testified that the computers were "ancient" when he

15

worked for the Halls, so "were obviously out of date" when later he worked for Myers LLC. *Id.* at 105. This evidence, however, does not establish that the computers were defective or inoperable at the time of the transfer to Buyer. We find no error with regard to the trial court's findings as to the condition of the computers.

### III.    Financial Representations

As part of the transaction, Seller prepared and provided a profit and loss statement covering the years 2007, 2008, and 2009 for the Fishers Store; that statement was incorporated into the Purchase Agreement as Schedule 2.12. *Appellants' App.* at 107-109. Buyer claims that the financial representations and warranties that Seller made in the Purchase Agreement were not true, accurate, or complete such that Seller failed to provide full disclosure regarding the financial condition of the Fishers Store and that the profit and loss statements "falsely and artificially increase[ed] the represented net profit" of the Fishers Store. *Appellants' Br.* at 33. The trial court entered a number of findings with regard to the alleged financial misrepresentations, which Buyer lists in its brief and alleges in a general fashion that such findings were in error. *Appellants' Br.* at 29-30 (alleging trial court's findings 5, 77-84, 91, 94-97, 101-104, 106-109 were in error). Buyer does not, however, provide specific argument, authority, or support to explain or identify why or how each finding is in error. The court of appeals will not become the advocate for a party by addressing arguments that are too poorly developed. *Thacker*, 797 N.E.2d at 345. That said, the crux of Buyer's position appears to be that it was not made aware of the fact that the HP5000 was not used to complete all the printing jobs that came into the Fishers store, some jobs were sent to the Carmel Store or another

outside vendor to be completed, and the Halls did not track those outsourced printing jobs. The evidence at trial, however, was that the outsourced jobs were tracked. The trial court found, and the evidence supports the findings, that the Fishers Store treated the Carmel Store as a vendor, such that the Fishers location was invoiced, charged, and paid for the use of the Roland 5400 (Findings 94 and 95). *Appellants' App*. at 23.

Buran explained that, at the time of a purchase, he or another employee would input the details of the order into the point-of-sale software called the CASper system. Among other details, Buran would identify in the CASper system whether the printing would be completed on the HP5000 or the Roland 5400, so that the production crew would know where it was going to be printed; that is, the two printers were distinguished in the point-of-sale recordkeeping system. *Tr*. at 156. At some date thereafter, Mrs. Hall, who was the bookkeeper and had been since they purchased the Carmel Store in 2000, would transfer information from CASper into QuickBooks. She testified that for those occasions when the Fishers Store used the Roland 5400 at the Carmel Store to complete its jobs, the Carmel Store would send an invoice to the Fishers Store to pay for the use of it. The Carmel Store and the Fishers Store kept separate bank accounts, and the Fishers Store would write a check for use of the printer that the Carmel Store would deposit in its account. Mrs. Hall explained that from a bookkeeping standpoint, the use of the Roland 5400 was accounted for as an "outside sales" expense, meaning that the Fishers Store incurred the expense of an outside vendor for digital imaging, whether that be the Carmel Store or Indy Imaging or elsewhere, for the production of the product. *Id*. at 465, 467.

Mr. Hall likewise testified that the Fishers Store paid for the use of the Roland 5400. He testified that the Fishers Store revenue that appeared in the profit and loss statements provided to Buyer reflected expenses that were or had been deducted for use of the Roland 5400.

Buyer argues that there was testimony to the contrary. For instance, Buyer cites to a portion of Mr. Hall's deposition testimony that he did not consider the Carmel Store to be a "vendor" to the Fishers Store because "it was all one company." *Tr*. at 531. Mrs. Hall at trial testified that, to the extent Mr. Hall did not characterize the Carmel Store as a "vendor" to the Fishers Store, in terms of the Fishers Store's usage of the Roland 5400, he was incorrect from a bookkeeping standpoint because the Carmel Store invoiced the Fishers Store, who would then pay for it. Buyer also presented at trial Buran's testimony that he was "pretty sure" the Carmel Store and the Fishers Store did not charge each other for the use of the printers. *Id*. at 123. Buran conceded, however, that he "wouldn't do anything" with invoices, as they would come in the mail and be passed on to Mrs. Hall. *Id*. at 132. The trial court heard the evidence and had the opportunity to evaluate the credibility of the witnesses, including their knowledge of a particular facet of the business, such as the bookkeeping and invoicing practices, and whether the use of the Roland 5400 was considered an expense of the operation of the Fishers Store. It is not within our province to reweigh the evidence. *H & G Ortho, Inc.*, 823 N.E.2d at 729.

Prior to trial, Seller produced profit and loss statements. The trial court determined that there was no evidence that the financial warranties provided to Buyer in Schedule 2.12 were incorrect or misrepresented the revenue, expenses, or costs of goods

18

sold for the Fishers Store (Findings 105, 106, 107). *Appellants' App*. at 24. Robert conceded that he hired an accountant to review the financial information prior to the purchase, and no errors or issues or concerns were raised at that time. *Tr*. at 332. The profit and loss statements provided to Buyer prior to the sale included a category of "business mix," which referred to what portion of the Fishers Store's business was from inside sales versus outside sales, although according to Mr. Hall, Robert did not ever inquire about the meaning or implication of those figures. *Id*. at 800; *Appellants' App*. at 108.

Buyer has failed to establish that the trial court's findings with regard to the financial representations made to Buyer prior to the sale were unsupported by the evidence or were in error.

### IV. Snow Removal Bill

According to Buyer, Seller failed to pay a $1,327.69 bill for snow removal that occurred during early 2009, at a time when Seller owned and operated the Fishers Store. Buyer argues that Seller was in breach of the Purchase Agreement for its failure to pay and that the trial court should have found Seller liable for the bill, legal fees, and costs. Buyer maintains that "[p]ursuant to the terms of the Purchase Agreement, Seller was responsible for all debts arising prior to the [p]urchase of the [the Fishers Store]." *Appellants' Br*. at 29. However, Buyer does not identify the applicable term(s) or specific section(s) of the Purchase Agreement upon which it relies. As previously stated, our appellate rules require more. *See* Ind. Appellate Rule 46(A)(8).

Nevertheless, we recognize that a copy of the invoice from the landlord for the snow removal was admitted at trial without objection. Robert testified that the bill covered snow removal in early 2009, before Myers LLC purchased the Fishers Store and that Myers LLC paid the invoice. *Tr.* at 217-18. No other testimony or evidence was presented on the matter. The trial court entered no finding or conclusion on the snow removal issue. Because a copy of neither the counterclaim against Myers LLC nor the third-party complaint against the Halls is included in the record before us, we do not know with certainty what claims were raised therein.[4] Given that there was uncontradicted evidence presented at trial on the snow removal issue, and for the sake of completeness and clarity, we remand to the trial court to enter specific findings and conclusions on the matter. The findings of fact, conclusions thereon, and judgment are affirmed in all other respects.

Affirmed and remanded.

BAKER, J., and ROBB, J., concur.

---

[4] The trial court denied Buyer's counterclaim and its third-party complaint, concluding that Buyer failed to prove that Seller breached the Purchase Agreement. *Appellants' App*. at 25, 27 (Conclusion II, Judgment (B) and (C)). Assuming without deciding that Buyer's claim for payment of the snow removal is part and parcel of either of those pleadings, Buyer is appealing from a negative judgment and must demonstrate that the trial court's judgment is contrary to law. *Huber v. Sering*, 867 N.E.2d 698, 706 (Ind. Ct. App. 2007), *trans. denied*. A judgment is contrary to law only if the evidence in the record, along with all reasonable inferences, is without conflict and leads unerringly to a conclusion opposite that reached by the trial court. *Id*.